IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
January 14, 2004 Session

## STATE OF TENNESSEE v. MONQUEZE L. SUMMERS

**Appeal from the Criminal Court for Davidson County**
**No. 2001-D-2297      J. Randall Wyatt, Jr., Judge**

---

**No. M2003-00379-CCA-R3-CD - Filed September 15, 2004**

---

The case before us concerns the untimely death of Montrell Mason and the aggravated robbery of Clinton Anderson and Christopher Fears. The defendant stands convicted of Mason's felony murder in the perpetration of robbery, two counts of aggravated robbery, and weapon possession. We affirm the convictions and sentences.

**Tenn. R. App. P. 3; Judgment of the Criminal Court is Affirmed.**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which JOSEPH M. TIPTON and JOHN EVERETT WILLIAMS, JJ., joined.

James L. Weatherly, Nashville, Tennessee, for the Appellant, Monqueze L. Summers.

Paul G. Summers, Attorney General & Reporter; Helena Walton Yarbrough, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and James H. Todd, Assistant District Attorney General, for the Appellee, State of Tennessee.

### OPINION

The evidence at trial was highly controverted, and various witnesses for the prosecution and the defense testified in sharp conflict to one another. The state's case relied in significant part on the testimony of Jarquis Hendricks, who testified that on the evening of August 13, 1999, he was with the defendant and some of his other acquaintances at a Teen Night at 328 Performance Hall in Nashville. While there, Hendricks and Renaldo Clay got into a disagreement with the victim and some of the victim's friends, although the incident was resolved and Hendricks and the victim gave each other some "dap," meaning that they shook hands. Several minutes later, Hendricks was outside when the defendant came out of the club. The defendant, who had not been part of the disagreement in which Hendricks and the victim had been involved, was upset and said that he had been "ganged" inside. The defendant said, "I'm gonna burn one of 'em. I'm going to show them I ain't no ho [sic]."

According to Hendricks' testimony, Renaldo Clay, the defendant, and Hendricks found a ride to the University Court housing development with someone named Bobby and an unidentified passenger. The defendant went to his sister's house and returned with Orlando Bass in about ten minutes, while Hendricks and Clay stayed behind in the driveway. The defendant proposed that they return to 328 Performance Hall. Bass, Clay, Hendricks, and the defendant got into the defendant's sister's car. On the way back to the club, the defendant, who was driving, took out a gun and checked the clip.

When the group arrived in the area of 328 Performance Hall, they saw the young men with whom there had been an earlier disagreement. Although the chronology is somewhat imprecise, Hendricks saw Bass with a gun in his hand. The defendant asked Bass what type of weapon it was, and then the defendant and Bass switched weapons with each other. Hendricks claimed that the three other men walked toward the other group of men, although he stayed behind. The defendant and Clay were holding guns at their sides. Hendricks returned to the car and sat in the driver's seat because he thought "they were robbing 'em or something was fixing to happen, probably." After two or three minutes, Clay and Bass returned and got into the car. Hendricks then heard a gunshot. He turned and saw a second shot being fired by the defendant. The defendant returned to the car and said that he thought he hit one of them. The group then drove to University Court.

A detective who interviewed Hendricks shortly after the crimes testified about several inconsistencies between Hendricks' testimony and his prior statement, including that Hendricks had previously claimed to have seen the defendant walking back toward the car when shots were fired. Additionally, Hendricks had said that an individual named Rico had been present.

Cy-Silvia Jordan, who at the time of the crimes was the defendant's brother's girlfriend, testified for the state. Jordan was present at a home in University Court on the night of the victim's death. She testified that the defendant came to the home, said that "a bunch of Lischey guys were causing a problem," and asked his brother for a gun. The defendant left with a .45 handgun.

Jordan admitted on cross-examination that she was testifying as part of a plea agreement relative to a charge of especially aggravated robbery. She likewise admitted that she had been a psychiatric inpatient and was taking Haldol and Cogentin. Further, she admitted that she had not initially contacted the police with the information and that she had only done so after a disagreement with Shaun Summers, the defendant's brother.

Various police officers provided testimony that after they were summoned to the scene, they found the deceased victim in the driver's seat of a yellow Oldsmobile parked in front of a building at Fourth Avenue and Lee Street. The victim had been shot in the back of the head. The doors were open and the brake lights were on. The back passenger side window was shattered, and the driver's side rear tire was flat. A nine millimeter shell casing and a copper jacket were recovered.

Christopher Fears testified that he had been a friend of the victim and had been with the victim the night of his death. He had been riding in a car with the victim, Clinton Anderson, and Elton Price in heavy, backed-up traffic when the victim accidentally dropped $100 out the window. The victim got out of the car to get his money. Fears heard someone shooting into the air. Price said he was going to get a pistol, and the victim took the wheel. They traveled a short distance further and parked. They got out of the car, and the victim talked to a group of people, of whom the defendant was one. Three or four of these individuals had handguns and robbed Fears. He denied that the defendant was one of the robbers, although he said that the defendant had a gun at his side. Fears claimed that although Mason had about $1,000, Mason was not robbed.

Clinton Anderson did not testify for the state. His mother did testify outside the jury's presence, however, and claimed that after arriving at the courthouse on the first day of the defendant's trial, her son told her that he was "stressed" and was leaving town.

The court admitted a tape of Anderson's prior testimony in a juvenile court hearing, in which Anderson recounted that he had been with a group of men, including the victim, on the night of the victim's death. They went to a club and then went riding around. Anderson was initially riding around with Elton Price, and they picked up the victim. The victim dropped a $100 bill, and someone picked it up and talked to the victim. Anderson recounted in ambiguous terms that there was an argument and shooting into the air. Apparently, the three men got out of the car during this incident. They then returned to the car. The defendant said that they had "ganged" him in the club and told them to "lay things out." Anderson said that he and Fears emptied their pockets. Someone other than the defendant picked up the contents, and no one handed any of Anderson's money to the defendant. The victim did not drop anything from his pocket, and the defendant said that the victim was "cool." Anderson claimed that neither he nor any of his companions had a weapon, but he saw at least one weapon in the group - the one the defendant was pointing at the victim. He thought he saw other weapons that were pointed down, but he was not sure how many. Anderson claimed that the victim told him to go get the victim's gun. Anderson and Fears walked away, and as Anderson approached Elton Price, he heard two gunshots. Anderson and Price went back to the location of the robbery, and they discovered the victim in the car with a gunshot wound to the head.

To counter the state's proof, the defendant began his case-in-chief with the testimony of his brother, Shawn Summers. The defendant's brother recounted that he had a tempestuous relationship with Cy-Silvia Jordan, who he characterized as controlling and mentally unstable. He claimed that Jordan threatened that if he broke up with her, she would seek revenge by making untrue statements to the authorities about the defendant's criminal charges. He claimed that she ultimately did just that, although she later apologized and said she thought it was a joke. He said that the lie that Jordan told was that someone came to the home on the night of the crimes and retrieved a gun.

Shawanda Summers, who is the defendant's sister, testified that she was alone on her porch at University Court in the early morning hours of August 14, 1999 when the defendant,

Renaldo Clay, and Jarquis Hendricks came up the stairs. She overheard the defendant ask Clay why he started shooting, to which Clay replied, "They was trying to jump me in the club."

The defendant testified. He admitted that in 1999 he had a gun that he kept at his sister's house. He claimed that he needed it for protection because he lived in a violent area. He testified that on the evening of August 13, 1999, he had Rico Halliburton drop him off at 328 Performance Hall. Halliburton left to have his hair braided, and the defendant stayed at the club for a few hours. While there, he saw Renaldo Clay and Jarquis Hendricks. The defendant denied that he got into a fight at the club, and he likewise denied that anyone threatened or attacked him.

At about 11 p.m., the defendant began looking for a ride because Halliburton had not yet returned. He saw Clay and Hendricks outside the club and decided to look for a ride to University Court with them. Hendricks arranged for someone named Bobby to give them a ride. The defendant denied that he made any statement about getting a gun to hurt someone while in Bobby's vehicle. After they arrived at University Court, Bass, Hendricks, Halliburton, Clay, and the defendant left in Halliburton's car to go to another club. The defendant admitted that while at University Court, he retrieved his gun in case someone tried to rob him, although he denied making a statement that he was going to "burn" anyone.

The group of young men tried to get into 328 Performance Hall, but a police officer would not admit some of them. They began walking toward an establishment called The Club. Someone, perhaps Hendricks, moved the car. Hendricks had to use the bathroom, and the rest of the group walked up the street and waited for Hendricks on the corner. While they were doing so, they heard two gunshots. The defendant and Clay took out their guns. The defendant held his gun at his side. A yellow car pulled up and backed in where the defendant and his group were assembled. Christopher Fears, Clinton Anderson, and Montrell Mason, the victim, were in the car. Clay told everyone to "lay it down." The defendant admitted that both he and Clay still had their guns out. The defendant claimed he intervened and told Clay that Mason was "cool" and that he was not going to let Clay rob his friend Mason. He said that this angered Clay, although Clay complied and backed off. The defendant said he did not see any money taken from Fears or Anderson. The defendant had a friendly conversation with Mason, and Fears and Anderson departed. The defendant claimed that he walked away, leaving Mason, Bass, Halliburton, and Clay. As he got around a corner, he heard two gunshots in rapid succession. The defendant jumped into the car that Halliburton had been driving, where he found Hendricks behind the wheel. They drove up an alley, and Clay got inside. On the way back to University Court, Clay and the defendant got into an argument when the defendant asked Clay whether he was the person who fired shots and Clay said that he was. The defendant inquired why Clay had done this, and Clay responded that they tried to "gang" him in the club. The defendant testified that Halliburton and Bass were also upset with Clay, although Hendricks did not appear to be so.

When they reached University Court, Halliburton and Bass drove back to the scene to see whether Mason was okay. Hendricks, Clay, and the defendant walked to the defendant's sister's house. The defendant claimed that he admonished Clay that he did not have to shoot Mason.

The defendant denied that he was the one who shot Mason, and he likewise denied any involvement in a robbery of Anderson and Fears.

After receiving this proof, the jury found the defendant not guilty of premeditated murder but guilty of felony murder, two counts of aggravated robbery, and possession of a deadly weapon. The court imposed a life sentence for the felony murder conviction, and in the sentencing hearing that followed, the court ordered ten-year sentences for the aggravated robbery convictions and a one-year sentence for the weapon offense, with the latter three sentences to be served concurrently to each other but consecutively to the murder sentence, for an effective sentence of life plus ten years. The defendant then filed this appeal.

**Sufficiency**

The defendant assails the sufficiency of the evidence underlying his convictions of felony murder and aggravated robbery. When an accused challenges the sufficiency of the convicting evidence, this court must review the record to determine if the evidence adduced at trial is sufficient "to support the finding by the trier of fact of guilt beyond a reasonable doubt." Tenn. R. App. P. 13(e). This rule is applicable to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990), overruled in part by *State v. Hooper*, 29 S.W.3d 1 (Tenn. 2000).

In determining the sufficiency of the convicting evidence, this court does not re-weigh or re-evaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this court substitute its inferences for those drawn by the trier of fact from circumstantial evidence. *Liakas v. State*, 199 Tenn. 298, 305, 286 S.W.2d 856, 859 (1956). To the contrary, this court is required to afford the state the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978).

Questions concerning the credibility of the witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact, not this court. *Id.* In *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973), our supreme court said, "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State."

Because a verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt, the accused, as the appellant, has the burden in this court of illustrating why the evidence is insufficient to support the verdicts returned by the trier of fact. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). This court will not disturb a verdict of guilt due to the sufficiency of the evidence unless the facts contained in the record are insufficient, as a matter of law, for a rational trier of fact to find that the accused is guilty beyond a reasonable doubt. *Id.*

With respect to the felony-murder conviction, the defendant argues that the proof does not support a jury finding of robbery of Montrell Mason. He claims that the jury's rejection of the premeditated murder count necessarily implies that the jury rejected the premise that the defendant fired the fatal shot, and because there is not sufficient proof of a robbery of Mason, a conviction of felony murder in perpetration of robbery cannot lie. We disagree that the proof is lacking.

First of all, the jury's rejection of the premeditated murder count does not mean that the jury did not believe that the defendant fired the fatal shot; it simply means that the jury had a reasonable doubt as to whether he did so intentionally and with premeditation.

Second, felony murder is "[a] killing of another committed in the perpetration of or attempt to perpetrate any . . . robbery . . . ." Tenn. Code Ann. § 39-13-202(a)(2) (2003). The indictment charges the defendant with killing Mason during the perpetration of or attempt to perpetrate "a robbery." The indictment does not specify that the robbery was of Mason. In the light most favorable to the state, the evidence presented demonstrates that the defendant committed robbery of or at least attempted to rob Christopher Fears and Clinton Anderson, and in the course of perpetrating those crimes, Montrell Mason was shot. In order for us to conclude that no rational jury could reach this conclusion, we would be required to discredit portions of the state's evidence, and we are not free to make credibility assessments contrary to those made by the trier of fact. *See, e.g., Cabbage*, 571 S.W.2d at 835. Specifically, the state presented evidence via Clinton Anderson's prior testimony, in which he claimed that the defendant, who had a weapon, told Fears and Anderson to "lay things out." In response, they emptied their pockets, and someone other than the defendant picked up the contents. Mason told Fears and Anderson to go get his gun from Elton Price, and the two walked away and then heard two gunshots. When they returned to the scene, they found the mortally wounded victim.[1]

Alternatively, there is evidence that supports the defendant's guilt on a theory of criminal responsibility. *See* Tenn. Code Ann. § 39-11-402(2) (2003) (A person is criminally responsible for the crime committed by another if "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids or attempts to aid another person to commit the offense[.]"). Other witnesses placed the defendant at the scene with a weapon in his hand, although their testimony did not identify the

---

[1]In his brief, the defendant bases his sufficiency argument in part on the trial court's jury instructions that the predicate felony for a finding of guilt of felony murder was the robbery of Mason. Although the defendant has accurately portrayed the jury instructions given by the trial court, the instructions were more narrow in this respect than called for by the indictment. However, to the extent that the instruction may be viewed as error, we have no hesitation in concluding that it was harmless beyond a reasonable doubt. The jury was fully instructed on the offenses of felony murder and robbery. The jury found the defendant guilty of two counts of aggravated robbery of Clinton Anderson and Christopher Fears. According to the evidence, if a robbery of Mason was attempted at all, it occurred at the same time and in the same manner as the robberies of Anderson and Fears. *Cf. State v. Teel*, 793 S.W.2d 236, 249-50 (Tenn. 1990) (trial court's failure to instruct jury on underlying felony of rape was harmless error beyond reasonable doubt in guilt phase of first degree murder trial where jury found defendant guilty of both premeditated murder and felony murder and later found after receiving complete instructions in sentencing phase of trial that victim had been murdered in perpetration of rape).

defendant as the actor who demanded or collected pocket contents from Fears and Anderson. The defendant himself admitted that he was present and was displaying a weapon when Renaldo Clay attempted to rob Anderson, Fears, and Mason, although he claimed that he intervened to prevent Clay from taking anything from Mason. The defendant did not make a similar claim he attempted to prevent a robbery of Anderson or Fears; he merely said that he did not see any money being taken from them. Given the defendant's association with Clay in these circumstances, the jury was within its province in finding the defendant guilty of felony murder based upon the predicate crime of robbery via a theory of criminal responsibility.

The defendant also challenges the sufficiency of the evidence to support his separate convictions of aggravated robbery of Fears and Anderson. Aggravated robbery, as relevant here, is "the intentional or knowing theft of property from the person of another by violence or putting the person in fear" which is "accomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon[.]" *Id.* §§ 39-13-401(a) (2003) (robbery); 39-13-402(a)(1) (2003) (aggravated robbery). As discussed above, the evidence viewed in the light most favorable to the state demonstrates that the defendant, armed with a handgun, demanded that Fears and Anderson "lay things out" and that someone in the defendant's group took the items that the victims surrendered. That this evidence was controverted at trial is not fatal to the state's case; the jury chose to accredit this evidence over that to the contrary, and we may not revisit questions of credibility on appellate review.

For these reasons, we reject the defendant's challenges to the sufficiency of the convicting evidence for the felony murder and aggravated robbery convictions.

### Judicial Use Immunity - Rico Halliburton

In a novel issue, the defendant claims that the lower court erred in denying his bid for judicial use immunity for prospective witness Rico Halliburton. Relying heavily on the Third Circuit case of *Virgin Islands v. Smith*, 615 F.2d 964 (3d Cir. 1980), the defendant contends that due process required that the court grant use immunity for Halliburton. As the defendant correctly notes, this is an issue of first impression in Tennessee.

Halliburton invoked his Fifth Amendment privilege when questioned about the crimes for which the defendant was on trial. The defense anticipated that if immunized, Halliburton would testify that he was present at the time the victim was shot and saw Renaldo Clay, not the defendant, fire the fatal shot. The defense based this expectation on Halliburton's prior statement to law enforcement authorities to this effect. As a second, less preferable alternative to use immunity, the defense initially proposed that it be allowed to introduce a videotape of Halliburton's prior statement. The court denied the defendant's bid for use immunity for Halliburton but ruled that the videotape could be admitted and encouraged the parties to agree on which portion of the tape was relevant. The parties were unable to reach an agreement, and the defense withdrew its request to admit the tape while attempting to reserve its objection to the court's ruling relative to use immunity.

-7-

Use immunity generally refers to a federal prosecutor's discretionary authority to grant a witness immunity from prosecution based upon his compelled testimony, when doing so is in the public interest. *See* 18 U.S.C. §§ 6002 *et seq.*; *United States v. Mohney*, 949 F.2d 1397, 1401 (6th Cir. 1991). Some states have recognized use immunity as a matter of state law. *See generally* Robert M. Schoenhaus, *Prosecutor's Power to Grant Prosecution Witness Immunity from Prosecution*, 4 A.L.R.4th 1221. In Tennessee, immunity agreements are enforceable via principles of contract law. *State v. Howington*, 907 S.W.2d 403 (Tenn. 1995).

The criminal defendant has no discretion of his own to immunize those witnesses who might offer favorable testimony for the defense were it not for their own concerns about self-incrimination. It is foreseeable that in certain situations, the prosecution's power to grant immunity to its witnesses, without the defense having companion power for immunizing its witnesses, might result in the prosecution having the ability to intentionally distort the fact-finding process, or at a minimum, having far superior access to evidence as compared with the defense. *See Mohney*, 949 F.2d at 1402. Thus, some jurisdictions have recognized either or both of two theories by which use immunity may be conferred upon defense witnesses – when it is necessary so that the defendant may mount an effective defense and/or when it is necessary to overcome prosecutorial misconduct.[2] *See United States v. Pennell*, 737 F.2d 521, 526 (6th Cir. 1984). The basis for such a grant of immunity is due process. *Id.* at 526-27.

The defendant in the case at bar asks us to hold, as a matter of due process, that the trial court erred in failing to order use immunity for Rico Halliburton so that the defendant might present evidence via Halliburton's testimony that Renaldo Clay, not the defendant, shot the victim. He asks that the court recognize judicial use immunity under the effective defense theory, and he does not make a claim of prosecutorial misconduct.

Although the existence of use immunity for defense witnesses in Tennessee is an intriguing one, we are not inclined to resolve the question given the facts of the case at bar. We are unpersuaded that the defendant has demonstrated that his due process rights were infringed upon by the absence of Halliburton's testimony. Thus, even if defense-benefitted use immunity were established in Tennessee, the defendant has not presented facts which would support its application in his case.

Tennessee law provides guidance for review of claims of violation of a criminal defendant's constitutional right to present a defense. The factors to be considered are whether

1.      the excluded evidence is critical to the defense;
2.      the evidence bears sufficient indicia of reliability; and
3.      the interest supporting exclusion of the evidence is substantially important.

---

[2]In the former situation, the court would order the prosecutor to confer immunity on the prospective defense witness, whereas in the latter situation, the court itself would exercise its inherent authority to confer the immunity to effectuate the defendant's compulsory process right. *See Virgin Islands v. Smith*, 615 F.2d 964, 969 (3d Cir. 1980).

*State v. Brown*, 29 S.W.3d 427, 433-34 (Tenn. 2000) (citing *Chambers v. Mississippi*, 410 U.S. 284, 298-301, 93 S. Ct. 1038 (1973)); *see also State v. Powers*, 101 S.W.3d 383, 397 (Tenn.), *cert. denied*, 538 U.S. 1038, 123 S. Ct. 2083 (2003).

In the present case, the defendant cannot satisfy these prerequisites to establishing a constitutional claim; therefore, his bid for judicial use immunity for Halliburton must fail. We are not persuaded that the evidence is critical to the defense. The defendant posits that the Halliburton's anticipated testimony was "clearly exculpatory to [the defendant] Summers . . . and placed responsibility for the murder of Montrell Mason squarely at the feet of co-defendant, Renaldo Clay." At trial, defense counsel summarized the anticipated testimony from Halliburton as follows, "That he [Halliburton] was there, that he was part of everything that happened, that Monqueze Summers did not rob anybody, that the shots were fired by Renaldo Clay, not by Monqueze Summers." The evidence the defense sought to introduce via Halliburton's testimony, however, was also available via introduction of Halliburton's prior videotaped statement. The court ruled that the relevant portions of this tape could be admitted, but the defense withdrew its request for admission when it was unable to agree with the prosecution about which parts of the tape were relevant. Also, the defendant presented other evidence, both from his testimony and from other sources, that he neither robbed Fears and Anderson nor shot Mason. *Cf. Powers*, 101 S.W.3d at 397 (no due process deprivation where trial court's ruling did not amount to blanket exclusion of evidence relative to a particular topic). In fact, the jury at least partially rejected the state's case against the defendant by acquitting him of premeditated murder.[3]

Having determined that the excluded evidence was not critical to the defense, we need not conduct further analysis of the *Chambers* factors. The court committed no error in denying use immunity.

### Admission of Clinton Anderson's Juvenile Court Testimony

The defendant claims that the trial court erred in admitting the audiotaped prior testimony of Clinton Anderson from an earlier hearing in juvenile court. The court admitted this evidence under Tennessee Rule of Evidence 804, the rule governing hearsay exceptions for

---

[3] It is worth noting that with respect to the felony murder count, it matters not whether the defendant was the shooter, so long as the homicide occurred during the course of perpetrating the underlying felony. *See generally* Tenn. Code Ann. § 40-35-202(a)(2) (2003); *State v. Utley*, 928 S.W.2d 448, 451 (Tenn. Crim. App. 1995). To the extent that the defendant may claim that the evidence should have been admitted in order to avoid constitutional error relative to the premeditated murder count, any such error, even if it occurred, must be considered harmless given that the defendant was acquitted of this count. *See Powers*, 101 S.W.3d at 397-98 (constitutional claim that defendant was denied opportunity to present meaningful defense subject to harmless error analysis). Further, there was evidence from which the jury could, and perhaps did, conclude that the defendant was guilty of the two counts of aggravated robbery, whether or not they believed the defendant himself was the one who held a gun on the victims and told them to "lay it down." With respect to the weapon possession count, the defendant himself admitted that he was in possession of a handgun and had it out of his pants when, according to the defendant, Renaldo Clay robbed Fears and Anderson. Halliburton's testimony, even if fully accredited by the jury, would not remove the defendant from the scene or from involvement with the group of young men of which Halliburton claimed that he, Renaldo Clay, and the defendant were a part.

admission of prior statements of unavailable witnesses. The testimony contained on the tape generally inculpated the defendant as having taken part in a robbery of both Anderson and Christopher Fears. He also identified the defendant as one of three armed individuals at the scene of the robbery, although Anderson did not identify the defendant as the shooter. He claimed he left the scene after the robbery, heard shots, and returned to find the victim mortally wounded. Anderson testified he did not see who fired the shots.

Clinton Anderson initially appeared on the first day of the trial, but he did not return the second day, and he could not be found despite the state's efforts to locate him. According to testimony received in a jury-out hearing from Anderson's mother, her son told her on the first day of trial that he was leaving town, and she did not know his whereabouts. A victim/witness advocate in the district attorney's office testified that Anderson's mother told her that Anderson had reported that he was feeling anxious about testifying, was leaving town, and did not reveal his intended destination. The victim/witness advocate testified that she doubted that Anderson had been subpoenaed. A court officer testified that he had subpoenaed Anderson by mail, and the subpoena had not been returned by the postal service. Both an investigator from the district attorney's office and a police detective testified about the attempts they made to find Anderson since his disappearance. Anderson's attorney testified that she had spoken with Anderson two times since his disappearance and had advised him of the significance of his nonappearance. According to counsel, Anderson expressed his intent to remain incommunicado.

On appellate review, the trial court's determination of admissibility will not be reversed unless the court abused its discretion in admitting or excluding the challenged evidence. *See, e.g., State v. Bigbee*, 885 S.W.2d 797, 806 (Tenn. 1994). As correctly argued by the defendant, admission of former testimony is governed by Tennessee Rule of Evidence 804, which provides a hearsay exception for the former testimony of a declarant who is unavailable as a witness if the testimony was "given as a witness at another hearing of the same or a different proceeding or in a deposition taken in compliance with the law in the course of the same or another proceeding, if the party against whom the testimony is now offered had both an opportunity and a similar motive to develop the testimony by direct, cross, or redirect examination." Tenn. R. Evid. 804(b)(1). Before such testimony will be admitted, however, the proponent must establish that the witness "[i]s absent from the hearing and the proponent of [the] statement has been unable to procure the declarant's attendance by process." Tenn. R. Evid. 804(a)(5). Further, in cases such as the one at bar in which the prosecution seeks to offer the former testimony of an unavailable witness, the state must establish two prerequisites in order to satisfy the defendant's constitutional right of confrontation. First, the state must show that the declarant is truly unavailable after good faith efforts to obtain his presence, and second, that the evidence carries its own indicia of reliability.[4] *State v. Arnold*, 719 S.W.2d 543,

---

[4]At one time, there was a third requirement, that the evidence not be crucial or devastating. *See State v. Henderson*, 554 S.W.2d 117, 119 (Tenn. 1977). More recent caselaw seems to have disposed of this third requirement. *See, e.g., State v. Grover Jesse Campbell*, No. 1113, slip op. at 6 n.2 (Tenn. Crim. App., Knoxville, Dec. 20, 1989) (noting supreme court's denial of permissive appeal in two cases in which court of criminal appeals had dispensed with "crucial and devastating" rule); *see also Arnold*, 719 S.W.2d at 548 ("crucial and devastating" rule inapplicable where

(continued...)

-10-

548 (Tenn. Crim. App. 1986) (stating the rule of *Ohio v. Roberts*, 448 U.S. 56, 100 S. Ct. 2531 (1980)[5]).  With respect to the latter requirement, the United States Supreme Court has recently said that reliability of a prior testimonial statement is shown exclusively via cross-examination.  *See Crawford v. Washington*, — U.S. —, 124 S. Ct. 1354 (2004).

The defendant in the case at bar posits that Clinton Anderson was not unavailable as that term is contemplated by Rule 804 because he was never subpoenaed and because defense counsel did not have a similar motive to cross-examine him in the juvenile court hearing as would have existed had Anderson testified at trial.  First, we reject the defendant's claim that Anderson was not an unavailable witness.  Although the record does not resolve the question whether Anderson was ever actually served with a subpoena, it is clear that Anderson was aware of the proceedings and that the state sought to introduce his testimony.  Moreover, it is undisputed that he intentionally absented himself from the proceedings and took steps to keep the state from discovering his whereabouts.  The state presented evidence of its agents' efforts to locate the witness.  Anderson's attorney counseled him about the importance of coming to court, but he persisted in his refusal to do so. These facts all support a finding that the state made good faith efforts to locate the witness but was unable to do so.  Given these facts, the presence or absence of a subpoena appears irrelevant.

Likewise, the evidence presented demonstrates that Anderson's former testimony was reliable.  The defendant had a similar motive and opportunity in the juvenile court proceeding to develop Anderson's testimony through cross-examination.  The proceeding in question was the defendant's transfer hearing, at which one of the issues was whether there were reasonable grounds to believe that the defendant committed the alleged acts.  *See* Tenn. Code Ann. § 37-1-134(a)(3) (2001).

Given these circumstances, we hold that the lower court acted within its discretion in admitting Clinton Anderson's prior testimony based upon his unavailability to the state at the time of trial.

### Jury Instructions - Intentional and Knowing

The defendant also claims that the trial court erred in its jury instructions because it gave all of the alternative definitions of the mental states of intentionally and knowingly, rather than only those which applied to the crimes on trial.  He claims that he was deprived of his constitutional right to a unanimous verdict and that the effect of the instructions as given was to lower the government's burden of proof.

---

[4](...continued)
right of confrontation has been satisfied). The rules of evidence make no mention of this additional requirement.

[5]*Roberts* has recently been overruled.  *Crawford v. Washington*, ___ U.S. ___, 124 S. Ct. 1354 (2004).

The defendant claims that robbery is a crime defined by the conduct involved, as opposed to the result of that conduct. For this reason, he claims harmful error attended his convictions of felony murder predicated upon robbery and aggravated robbery.

Unfortunately for the defendant, in *State v. Jarret A. Guy*, No. M2002-02473-CCA-R3-CD, slip op. at 7-9 (Tenn. Crim. App., Jackson, May 11, 2004), another panel of this court affirmed facilitation of premeditated murder, felony murder, and robbery convictions which the defendant had challenged on the same basis as the defendant in this case. In pertinent part, that panel held:

> With regard to the defendant's convictions for felony murder and robbery, it is well-established that the required mental state for felony murder is the intent to commit the underlying felony. *See* Tenn. Code Ann. § 39-13-202(b); *State v. Ely*, 48 S.W.3d 710, 721 (Tenn. 2001). The underlying felony in this case was robbery. "Robbery is the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401(a). This court has held that robbery is not strictly a result of conduct crime. *See State v. Marcus Webb*, 2003 Tenn. Crim. App. LEXIS 68, No. W2002-00614-CCA-R3-CD (Tenn. Crim. App., at Jackson, Jan. 29, 2003). In *Marcus Webb*, the panel reasoned that "the knowing mens rea of robbery refers to the 'knowing theft.' The knowing mens rea of theft refers to 'knowingly obtaining or exercising control over the property.' The focus of the proscribed conduct is not upon its result." 2003 Tenn. Crim. App. LEXIS 68 at *11 (citations omitted).
>
> Further examination of the robbery statute establishes that not only must the defendant knowingly obtain or exercise control over property to be guilty of theft, and thus robbery, he must also intend to deprive the owner of the property. *See* Tenn. Code Ann. § 39-14-103. Intent to deprive the owner of property would require knowledge that the defendant is not the owner of the property. In consequence, to be guilty of robbery, an accused must intend to engage in certain conduct, obtaining or exercising control over property; he must intend a certain result, the deprivation of the property; and he must be aware that certain circumstances exist, that he is not the owner of the property. *Cf. State v. Hershel David Standridge*, 2003 Tenn. Crim. App. LEXIS 828, No. M202-01699-CCA-R3-CD (Tenn. Crim. App., at Knoxville, Sept. 30, 2003) (holding that theft is not a result-of-conduct offense because the conduct is criminal due to the circumstances surrounding the taking of the property of another). In our view, each definition of both intentional and knowing would be relevant for the jury's consideration of this offense. Accordingly, the trial court did not err by providing the result-of-conduct and nature-of-conduct definitions of "intentional" and did not err by providing the result-of-conduct, nature-of-conduct, and nature-of-circumstances definitions of "knowing."

*Jarret Guy*, slip op. at 8; *see also State v. Kevin L. Lawrence*, No. W2001-02638-CCA-R3-CD, slip op. at 5 n.6 (Tenn. Crim. App., Jackson, Oct. 9, 2003) (trial court did not err in giving all three definitions of knowing relative to crime of robbery as predicate felony for felony murder), *perm. app. granted* (Tenn. Mar. 8, 2004). Upon consideration, we are compelled by the logic of *Jarret Guy* and find it dispositive of the issue raised in the case at bar. Thus, the lower court did not err in its jury instructions relative to the definitions of the intentional and knowing mental states.

### Consecutive Sentencing

Finally, we come to the defendant's sentencing challenge. He claims that he should not have received consecutive sentencing. He also briefly, without discussion, contends that he should have received minimum sentences for the aggravated robbery offenses.

The lower court sentenced the defendant to ten-year terms for the two aggravated robbery convictions and one year for the weapon conviction. The court imposed these sentences to run concurrently to each other and consecutively to the life sentence for the felony murder conviction, for an effective sentence of life plus ten years. The court's rationale in ordering consecutive sentencing was that the defendant was on probation at the time he committed the offenses. *See* Tenn. Code Ann. § 40-35-115(b)(6) (2003).

When there is a challenge to the length, range, or manner of service of a sentence, it is the duty of this court to conduct a *de novo* review of the record with a presumption that the determinations made by the trial court are correct. Tenn. Code Ann. § 40-35-401(d) (2003). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991). "The burden of showing that the sentence is improper is upon the appellant." *Id*. In the event the record fails to demonstrate the required consideration by the trial court, review of the sentence is purely *de novo. Id.* If appellate review reflects the trial court properly considered all relevant factors and its findings of fact are adequately supported by the record, this court must affirm the sentence, "even if we would have preferred a different result." *State v. Fletcher*, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

In making its sentencing determination, the trial court, at the conclusion of the sentencing hearing, determines the range of sentence and then determines the specific sentence and the propriety of sentencing alternatives by considering (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the enhancement and mitigating factors; (6) any statements the defendant wishes to make in the defendant's behalf about sentencing; and (7) the potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-210(a), (b) (2003); 40-35-103(5) (2003); *State v. Holland*, 860 S.W.2d 53, 60 (Tenn. Crim. App. 1993).

In the present case, the trial court followed the sentencing procedures set out in the statute; we afford its determination presumptive correctness. We thus begin our review with that deference in mind.

We are mindful of the United States Supreme Court's recent decision in *Blakely v. Washington*, 542 U.S. —, 124 S. Ct. 2531 (2004), in which the High Court said that other than when based on the fact of a prior conviction, a judicially imposed sentence cannot exceed the maximum sentence statutorily allowed "solely on the basis of the facts reflected in the jury verdict or admitted by the defendant" unless the facts relied upon for enhancement are found to exist beyond a reasonable doubt by a jury. *Id.* at —, 124 S. Ct. at 2537 (emphasis omitted) ("[T]he relevant 'statutory maximum' is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose without any additional findings.") Although *Blakely* clearly applies to individual length-of-sentence determinations, it is unclear at the present time whether *Blakely* applies to consecutive sentencing.

Upon attempting to conduct an appellate review of the defendant's sentences, we have been hampered by the absence of the presentence report from the appellate record. As we have remarked on many occasions, it is the appellant's duty to include those things in the appellate record which are necessary to convey a fair, accurate, and complete account of what transpired in the trial court relative to the issues raised on appeal. *See* Tenn. R. App. P. 24; *State v. Troutman*, 979 S.W.2d 271, 274 (Tenn. 1998). The presentence report is evidence which is considered by the trial court and therefore is necessary to convey a fair, accurate, and complete account of the proceedings below. *See* Tenn. Code Ann. § 40-35-210(b) (2003)*; State v. Johnny Parker*, No. 03C01-9307-CR-00214 (Tenn. Crim. App., Knoxville, Nov. 22, 1994) (sentencing issue waived in absence of presentence report). In the absence of an adequate record on appeal, this court must presume that the trial court's rulings were supported by sufficient evidence. *State v. Oody*, 823 S.W.2d 554, 559 (Tenn. Crim. App. 1991).

For these reasons, we affirm the judgment of the lower court.

_____

JAMES CURWOOD WITT, JR., JUDGE