# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs August 24, 2010

## STATE OF TENNESSEE v. VICKY GILLIG, a/k/a VICKI GILLIG, a/k/a VICKY TAYLOR, a/k/a VICKY LITTLE

**Direct Appeal from the Criminal Court for Sullivan County**
**Nos. S55,382-84     R. Jerry Beck, Judge**

**No. E2010-00251-CCA-R3-CD - Filed November 2, 2010**

The defendant, Vicky Ann Gillig, a/k/a Vicki Gillig, a/k/a Vicky Taylor, a/k/a Vicky Little, entered best interest guilty pleas in the Sullivan County Criminal Court to the offenses of aggravated assault, a Class C felony; child abuse and neglect, a Class A misdemeanor; and contributing to the delinquency or unruliness of a minor, a Class A misdemeanor, in exchange for an effective sentence of four years. Following a sentencing hearing, the trial court denied the defendant's request for probation, the denial of which she now appeals. After review, we affirm the trial court's sentencing decision.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the Court, in which JOSEPH M. TIPTON, P.J., and THOMAS T. WOODALL, J., joined.

Steve McEwen, Mountain City, Tennessee (on appeal); and Andrew J. Gibbons, Assistant Public Defender (at trial), for the appellant, Vicky Gillig, a/k/a Vicki Gillig, a/k/a Vicky Taylor, a/k/a Vicky Little.

Robert E. Cooper, Jr., Attorney General and Reporter; Sophia S. Lee, Assistant Attorney General; H. Greeley Wells, Jr., District Attorney General; and Julie R. Canter, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## FACTS

The defendant was charged in case number S55,382 with child abuse and neglect, domestic assault, and aggravated child abuse and neglect of a victim under eight years of

age. In case number S55,383, the defendant was charged with child abuse and neglect, and domestic assault. In case number S55,384, the defendant was charged with contributing to the delinquency or unruly behavior of a minor. On August 26, 2009, the defendant entered best interest or Alford[1] guilty pleas to the lesser-included offense of aggravated assault in case number S55,382; child abuse and neglect in case number S55,383; and contributing to the delinquency or unruliness of a minor in case number S55,384. The remaining charges were dismissed. She received concurrent sentences of, respectively, four years; eleven months and twenty-nine days; and eleven months and twenty-nine days with the manner of service determined by the trial court following a sentencing hearing.

At the guilty plea hearing, the parties stipulated to the underlying facts as set forth in the affidavits of complaint. In case number S55,382, the affidavit of complaint showed that Officer Bryan Carter of the Kingsport Police Department responded to the hospital on February 27, 2008, in reference to an allegation that an eight-year-old child, C.L.,[2] the victim, had been beaten by her mother, the defendant. The officer noted that the victim had bruises around her eyes, a burst blood vessel to her left eye, and bruises on her left leg, left rib area, and neck. The officer also observed petechiae on the victim's neck, which is a typical result of being choked. The victim told the officer that the defendant had "beat her" and described that the defendant had put her fists in the victim's eye sockets and pushed, hit her on the leg with a broomstick, choked her, punched her in the stomach, and hit her in the face – bloodying her lip. The victim relayed to the officer that the defendant "beats her all the time and tells her to die."

The victim gave the same details to a Department of Children's Services ("DCS") caseworker, with the added information that the defendant kept her out of school for three days following the assault so no one would see the bruises. The victim's school attendance record corroborated the three unexcused absences. The victim's thirteen-year-old sister, B.T., told the caseworker that she was at the house during the assault and said that she ran to her room when the defendant began to "whip" the victim because she did not want to watch. B.T. said that in the past, she had seen the defendant "kick [the victim] in the stomach, pull her hair and bloody her mouth." Although she did not watch the assault, B.T. could tell what was going on and afterward, the victim "ran to her crying, 'Sissy, help me,' and told [B.T.] everything that happened."

---

[1] The United States Supreme Court held in North Carolina v. Alford, 400 U.S. 25, 37 (1970), that a defendant may plead guilty without admitting guilt if the defendant intelligently concludes that it is in his or her best interest to do so.

[2] It is the policy of this court to refer to minors by initials only.

The victim's eight-year-old cousin, T.L., was also at the house during the assault and heard the defendant and the victim arguing but went to his room "because he did not want to see it[.]" The defendant's sister, Susan Samples, lived at the residence but was not present during the incident. However, Samples said that the victim told her what happened, and the defendant instructed her that the victim "was not to go to school with bruises, because social services would be called." When interviewed, the defendant denied everything and said that everyone else was lying. The report detailed that the victim had reported abuse by her mother on another occasion, and that in December 2007, the defendant moved the victim to another school and "advised a school employee not to tell social services where [the victim] was, because they would 'start stuff.'"

In case number S55,383, the affidavit of complaint showed that a Kingsport Police Department detective, Penny Makowski, responded to Kingsley Elementary School on April 2, 2007, in reference to the victim having been assaulted by the defendant. The officer observed that the victim had bruises on her right ear, face, and back of her neck. The victim related to the officer that the defendant "got mad at her for slamming a door and hit her and threw her into the bedroom, causing her to hit the dresser." The victim also related to the officer that the defendant tied the victim's bedroom door closed when she was being punished. The defendant told the officer that "she was at her wits end" with the victim, but she did not physically abuse her. The defendant admitted tying the victim's bedroom door closed to keep her in when being punished. The officer observed that the defendant's house was a "pig sty."

In case number S55,384, the affidavit of complaint stated that the victim's school records were reviewed, and the records showed that the victim had twelve unexcused absences from September 19, 2007, to February 27, 2008. The victim was deemed truant by the truancy board. It was noted that the defendant had a history of moving the victim from school to school because of other abuse reports made by the victim.

The defendant testified that she read and understood the facts provided in the affidavits of complaint and was willing for the court to consider those facts as the basis for her pleas. She acknowledged that she was knowingly and voluntarily pleading guilty.

At the sentencing hearing, the defendant testified that she was employed at the Sportsman Inn, a restaurant, in Bristol and lived with her boyfriend, David Boggs, and daughter, B.T. Her daughter, the victim, was in foster care. She was attending counseling with the victim with the goal of reunification. She was also having supervised therapeutic visitation with the victim. According to the therapist, the defendant's parenting skills had improved dramatically, and they were going to begin unsupervised visitation upon resolution of the defendant's legal issues.

The defendant testified that the victim had some severe behavioral problems, and the victim's behavior and the defendant's ability to handle her behavior were issues being dealt with in counseling. In the past, the victim reacted very violently to being told no and would injure herself and her family. The defendant said that the victim's attitude had changed and that the counseling was going well for both of them. The defendant said that she and the victim talked almost every day.

The defendant acknowledged that she had a criminal record, which consisted primarily of convictions for passing bad checks and a failure to appear. She explained that she was told the wrong court date; it was not that she just did not show up for court. She said that the offenses occurred in a three-month time period in 1996 when she was twenty years old. She was placed on probation and, during that period, obtained her GED. The defendant admitted that she violated her probation in 1997 for failing to complete an intensive substance abuse program but completed her probation after a period of incarceration and the reinstatement of her probation.

On cross-examination, the defendant acknowledged that she had a positive drug screen in 1999. She admitted that she had been convicted in Hawkins County of a drug offense in March 2008 but explained that was because she "didn't have [her] prescription in [her] bottle." She also admitted that a probation violation was filed in January 2009, and her probation was extended in March 2009. She acknowledged making threatening calls to her ex-husband, Tim Taylor, after her guilty pleas in this case and while still on probation in Hawkins County. A tape of one of the phone calls was played for the court in which she repeatedly threatened to kill Taylor and his brother because Taylor's brother allegedly molested her daughter. The defendant admitted that she had a temper.

The defendant maintained that she was not guilty of the offenses against the victim. She said that Officer Carter was a liar if he put in his report that the victim had petechiae on her neck because the victim did not have any marks around her neck. The defendant said that the victim did not have bruises around her eye but looked like she might have had pink eye. The defendant acknowledged that her sister pled guilty to falsifying a police report regarding the underlying matter, but she was not aware that her sister told Detective Melanie Adkins that she had lied for the defendant in juvenile court because she was scared of her. The defendant testified that Detective Adkins only arrested her because she got mad at her. The defendant elaborated that Detective Adkins did not follow up on allegations that the victim had been sexually assaulted, and the defendant blamed Detective Adkins for her inaction.

Terry Grubbs testified that she had been serving as the victim's foster mother since October 2009. Grubbs and her husband have served as foster parents for ten years and are

specifically therapeutic foster parents, meaning they take children with severe behavioral problems or special needs. Grubbs said that she had witnessed the victim act out of control and injure herself, and the victim had accused Grubbs of injuring her and Grubbs's husband of yelling at her. Grubbs said that the victim "will literally tear up your home" if she is told "[n]o" to something. Grubbs believed that the victim's behavior had improved since she had been in counseling but thought "she still ha[d] a long way to go."

Grubbs testified that the victim had been in other foster homes and removed because of her behavior. Grubbs observed telephone calls between the victim and the defendant, and she noted that the victim "loves her mom" and wants to be with her. Grubbs noted that unlike some other foster children who are afraid of their biological parents, the victim was not afraid of the defendant. She said that the victim's behavior was much worse when she was not able to call or see the defendant.

On cross-examination, Grubbs acknowledged that children who have been physically abused often act out behaviorally and that sometimes victims of child abuse still love the parent who abused them.

Joyce Little, the defendant's mother and the victim's grandmother, testified that the victim lived with her for three weeks. Little said that the victim did not like being told "no" and the longer she stayed, the more she acted up. Little recalled an incident when she attempted to spank the victim for breaking an item in her home and missed, hitting her on the cheek instead. The victim threatened to report Little to DCS, and Little replied that she would tell DCS herself. Little stated that she had been in contact with the victim and the defendant since the counseling started and noticed an improvement in their relationship.

The defendant's presentence report was entered into evidence. The report revealed that the defendant had thirty-two prior convictions for violating the bad check law. According to the history of supervision in the presentence report, on December 18, 1997, the defendant was convicted of theft of services, failure to appear, and twenty-five counts of violating the bad check law for which she received a sentence of twenty-three months and twenty-eight days in the county jail. The defendant admitted to smoking marijuana on December 25, 1997, and failing a drug screen in January 1998. On March 16, 1998, the defendant was placed on probation for five years. A violation of probation was filed on August 28, 1998, because the defendant failed to complete a treatment program and had a positive drug screen. On October 15, 1998, the defendant was ordered to serve sixty days in the county jail and her probation was revoked but reinstated to intensive supervision. In another matter, the defendant was granted supervised probation by the Hawkins County General Sessions Court on March 19, 2008, following a conviction for an undefined drug offense. A violation of probation was filed on January 16, 2009, and the defendant's

probation was extended on March 9, 2009. The defendant had not yet paid her fines or completed her community service requirement.

The defendant reported that she began using marijuana "quite a bit on a daily basis" at the age of twenty-one. She last used marijuana in March 1999 when she was ordered to serve sixty days in jail for failing a drug screen. She started using cocaine at the age of twenty-two and used it daily in an amount up to one gram. She last used cocaine on August 29, 1998, "when she went to jail and to rehab." The defendant began using Lortab on a daily basis at the age of twenty-eight and last "abused" it in 2007. She said that she went to a suboxone clinic for treatment, but the information could not be verified. The presentence report indicated that the defendant was presently employed at Sportsman Inn restaurant, and the owner thought that "'she [wa]s one of the best employees [he had] ever had.'"

The presentence report also detailed that the investigating officer, Detective Adkins, found the defendant to be uncooperative during the investigation. Detective Adkins reported that the defendant made false statements alleging that Detective Adkins had made up the allegations and coerced her sister to likewise accuse the detective. Detective Adkins noted that the defendant's sister was indicted for perjury but later cooperated and admitted that she had lied because she was scared of the defendant.

At the conclusion of the sentencing hearing, the court denied probation and sentenced the defendant to confinement.

## ANALYSIS

On appeal, the defendant argues that the trial court erred in denying her a sentence of probation or, alternatively, a sentence of split confinement. When an accused challenges the length and manner of service of a sentence, it is the duty of this court to conduct a *de novo* review on the record "with a presumption that the determinations made by the court from which the appeal is taken are correct." Tenn. Code Ann. § 40-35-401(d) (2006). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). The presumption does not apply to the legal conclusions reached by the trial court in sentencing the accused or to the determinations made by the trial court which are predicated upon uncontroverted facts. State v. Butler, 900 S.W.2d 305, 311 (Tenn. Crim. App. 1994); State v. Smith, 891 S.W.2d 922, 929 (Tenn. Crim. App. 1994); State v. Bonestel, 871 S.W.2d 163, 166 (Tenn. Crim. App. 1993), overruled on other grounds by State v. Hooper, 29 S.W.3d 1, 9 (Tenn. 2000).

In conducting a *de novo* review of a sentence, this court must consider (a) any evidence received at the trial and/or sentencing hearing, (b) the presentence report, (c) the principles of sentencing, (d) the arguments of counsel relative to sentencing alternatives, (e) the nature and characteristics of the offense, (f) any mitigating or enhancement factors, (g) any statistical information provided by the administrative office of the courts as to Tennessee sentencing practices for similar offenses; (h) any statements made by the accused in his own behalf; and (i) the accused's potential or lack of potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-103, -210 (2006); State v. Taylor, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001). The party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. Tenn. Code Ann. § 40-35-401 (2006), Sentencing Commission Cmts.; Ashby, 823 S.W.2d at 169.

A defendant who receives a sentence of ten years or less is eligible for probation, subject to certain exceptions. Tenn. Code Ann. § 40-35-303(a) (2006). Even if eligible, however, the defendant is not automatically entitled to probation as a matter of law. See Tenn. Code Ann. § 40-35-303(b). The burden is on the defendant to show the denial of probation was improper. Id.; see also State v. Summers, 159 S.W.3d 586, 599-600 (Tenn. Crim. App. 2004) (citing Ashby, 823 S.W.2d at 169); State v. Baker, 966 S.W.2d 429, 434 (Tenn. Crim. App. 1997) (stating that "[a] criminal defendant seeking full probation bears the burden on appeal of showing the sentence actually imposed is improper, and that full probation will be in both the best interest of the defendant and the public").

There is no bright line rule for determining when a defendant should be granted probation. State v. Bingham, 910 S.W.2d 448, 456 (Tenn. Crim. App. 1995), overruled on other grounds by Hooper, 29 S.W.3d at 9-10. Every sentencing decision necessarily requires a case-by-case analysis. Id. Factors to be considered include the circumstances surrounding the offense, the defendant's criminal record, the defendant's social history and present condition, the need for deterrence, and the best interest of the defendant and the public. State v. Goode, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997). Another appropriate factor for a trial court to consider in determining whether to grant probation is a defendant's credibility or lack thereof, as this reflects on the defendant's potential for rehabilitation. Id. Also relevant is whether a sentence of probation would unduly depreciate the seriousness of the offense. See State v. Davis, 940 S.W.2d 558, 559 (Tenn. 1997); Bingham, 910 S.W.2d at 456.

Under the revised Tennessee sentencing statutes, a defendant is no longer presumed to be a favorable candidate for alternative sentencing. State v. Carter, 254 S.W.3d 335, 347 (Tenn. 2008) (citing Tenn. Code Ann. § 40-35-102(6) (2006)). Instead, the "advisory" sentencing guidelines provide that a defendant "who is an especially mitigated or standard offender convicted of a Class C, D or E felony, should be considered as a favorable

candidate for alternative sentencing options in the absence of evidence to the contrary." Tenn. Code Ann. § 40-35-102(6) (2006).

A trial court may deny alternative sentencing and sentence a defendant to confinement based on any one of the following considerations:

> (A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

> (B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

> (C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.

Tenn. Code Ann. § 40-35-103(1) (2006). Furthermore, the defendant's potential for rehabilitation or lack thereof should be examined when determining whether an alternative sentence is appropriate. Id. § 40-35-103(5).

In sentencing the defendant, the court noted the injuries sustained by the victim and how they were committed in determining that the defendant committed a "significant assault." The court observed that the defendant had previously violated the terms of her probation on more than one occasion. The court questioned the defendant's characterization of the victim as having a violent nature and being manipulative, noting that "[w]e're talking about a[n] eight-year-old child . . . whose statements to the police officer w[ere] consistent with the injuries that the officer observed." The court noted that the defendant was employed but also that she "ha[d] a temper[.]" In denying probation and alternative sentencing, the court stated that "because of the [d]efendant's prior unsuccessful tenures on probation, . . . [a]nd I recognize they're old. If she was in here on a property crime, considering our prison overcrowding, I might consider some type of relief. But . . . the crime she's committed is extreme violence."

We discern no error in the trial court's sentencing determination. The record shows that measures less restrictive than confinement have been applied unsuccessfully to the defendant. Regarding a sentence of probation ten years ago, the defendant failed a drug screen apparently twice as well as failed to complete a substance abuse treatment program, leading to the revocation of her probation. Recently, a probation violation was filed on another sentence of probation. The record reflects that her probation was extended, but the defendant had yet to complete the community service requirement or pay her fines.

Moreover, although the defendant denied any wrongdoing, the record supports the denial of probation based on the nature of the offenses. The evidence shows that the victim sustained injuries to her eyes, ribs, legs, and neck as a result of the defendant's pushing her fists into the victim's eye sockets, hitting her with a broom, and punching her. Officer Carter observed markings on the victim's neck indicative of her having been choked.

Furthermore, in its decision, the court clearly questioned the defendant's characterization of the victim as violent and manipulative, which indicates that the court considered the defendant's blaming others and failure to accept responsibility for her actions as a poor reflection on her potential for rehabilitation. See State v. Zeolia, 928 S.W.2d 457, 463 (Tenn. Crim. App. 1996). At the sentencing hearing, the defendant accused Officer Carter of lying about the victim's injuries. Her proof at sentencing was to demonstrate that the victim had severe behavioral problems and may have caused her own injuries. However, the defendant's older daughter, B.T., told a case worker that "when [the defendant] began to whip [the victim], she ran to her room because she did not want to watch. She said that in the past, she ha[d] seen her mother kick [the victim] in the stomach, pull her hair and bloody her mouth." We conclude, therefore, that the record supports the trial court's denial of the defendant's request for a sentence involving probation.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the sentencing decision of the trial court.

_____
ALAN E. GLENN, JUDGE