IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs August 18, 2010

## STATE OF TENNESSEE v. MICHAEL DESHAY PEOPLES, JR.

**Appeal from the Criminal Court for Davidson County**
**No. 2006-C-1980      Mark J. Fishburn, Judge**

_____

**No. M2009-01783-CCA-R3-CD - Filed September 10, 2010**

_____

The Defendant, Michael Deshay Peoples, Jr., was charged with one count of first degree felony murder, one count of especially aggravated robbery, a Class A felony, two counts of aggravated robbery, a Class B felony, and one count of aggravated kidnapping, a Class B felony. See Tenn. Code Ann. §§ 39-13-403(b), -402(b), -304(b)(1). One count of aggravated robbery was "nol prossed" by the State prior to the Defendant's trial. Following a jury trial, the Defendant was convicted of all four remaining offenses as charged. In this direct appeal, the Defendant contends that: (1) the State presented evidence insufficient to convict him; and (2) the trial court erred when it allowed testimony regarding the count of aggravated robbery that was "nol prossed" prior to the Defendant's trial. After our review, we affirm the judgments of the trial court.

**Tenn. R. App. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

DAVID H. WELLES, J., delivered the opinion of the Court, in which NORMA MCGEE OGLE and ROBERT W. WEDEMEYER, JJ., joined.

David Scott Wilder, Nashville, Tennessee, for the appellant, Michael Deshay Peoples, Jr.

Robert E. Cooper, Jr., Attorney General and Reporter; Deshaea Dulany Faughn, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Rob McGuire, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## Factual Background

On the evening of October 12, 2005, shortly after 7:00 p.m., three armed men entered a Nashville apartment, located in the Hickory Trace Apartment complex, occupied by Sean Wells and Abdulahi Musse.

At the time, Mr. Wells was a drug dealer, selling small amounts of marijuana and cocaine. His friend, DeAndre Winkfield,[1] was also at the apartment that evening. Mr. Winkfield briefly left the apartment to make a quick sale of marijuana. Mr. Wells testified that when Mr. Winkfield returned a couple of minutes later, he came into the apartment with "his hands up and there were three guys behind him, all of them had guns." One of the intruders was holding a gun to Mr. Winkfield's head. Mr. Wells testified that all three intruders had guns, but at trial he only described two guns—a chrome .45 caliber that was being held to Mr. Winkfield's head and a smaller dark gun. Mr. Wells also recalled that each of the men had an item of clothing over his face or wore dark glasses, but that he could tell all of the intruders were black and appeared to be around his age, 21. He stated that he did not know the intruders, but that he was subsequently able to identify two of the men. The Defendant was not one of the men Mr. Wells identified.

The intruders ordered Mr. Wells to put his hands up and took cocaine, marijuana, money, and his cell phone from his pockets. The men started to empty Mr. Musse's pockets, but Mr. Musse resisted, and they pistol whipped him in the face in order to get him to calm down. Mr. Wells testified that he thought it was the intruder with the dark gun who pistol whipped Mr. Musse. The three men forced Mr. Wells, Mr. Musse, and Mr. Winkfield to stay on their knees, up against the wall, and demanded an ounce of "weed." Mr. Wells testified that the three men did not stay together and that "they each had one of us." One of the intruders started going through the apartment to look for items of value. The intruders asked if there were any guns in the apartment, but the victims denied having any. However, the intruders soon found a gun in a bag that Mr. Winkfield had brought over to the apartment earlier. Mr. Wells only saw the barrel of Mr. Winkfield's gun, but he described it as an "AK." After the intruders found Mr. Winkfield's gun, they took him into the bathroom. Mr. Wells testified that he thought they were going to shoot Mr. Winkfield because he lied about not having a gun.

Shortly after, someone knocked on the door. After some discussion, the intruders decided to let the person inside. However, once they opened the door, the person outside the

---

[1] Mr. Winkfield did not testify during the Defendant's trial. Sergeant Joseph Winter testified that Mr. Winkfield had outstanding arrest warrants and was at large at the time of the trial.

door ran off. Then, according to Mr. Wells, "they went after him, and [Mr. Winkfield] also got out at that time." Mr. Wells said it all happened very fast. He did not see the order in which the person at the door, Mr. Winkfield, and two of the intruders left the apartment. He did say, though, that he was the last one out, Mr. Musse was right before him, and one of the intruders was in front of Mr. Musse.

Mr. Musse tried to get the gun from the intruder who fled in front of him, and a struggle ensued. Mr. Wells remembered hearing one gunshot. He stated that, at the time of the gunshot, Mr. Musse and the intruder were in the breezeway outside of the apartment and that he was standing by the door. He did not see where the other two intruders went. Mr. Wells testified that Mr. Musse hit the ground after the gunshot and that the gunman ordered Mr. Wells not to move. He stated that the intruder who shot Mr. Musse had a chrome gun. He said the gunman ran up the steps and that he did not see where he went. Mr. Wells stated that Mr. Musse was unconscious and that it looked like he had bullet wounds in his ear, shoulder, and chest. After checking on Mr. Musse, Mr. Wells banged on his neighbors' doors and searched for someone who could call 911.

At the Defendant's trial, Mr. Wells testified that all three men were talking during the robbery, but that he could not tell who was in charge. He testified that they seemed to be working together and that it "looked like it wasn't anything new, like they were used to it." Mr. Wells said that it did not seem like any of the three men were reluctant to participate in the robbery.

Jessie Bentley and her husband lived in an apartment two stories above where Mr. Musse was shot. Ms. Bentley's apartment had a view of the parking lot. She testified that on the evening of October 12, 2005, around 9:30 or 10:30 p.m., she was on her balcony smoking a cigarette when she noticed a red car in the parking lot that looked suspicious because it was backed into a parking space and had its parking lights on. She did not know if the car was running or if there was anyone in the car. Ms. Bentley also stated that she heard at least two gunshots and then "saw a man running in the parking lot, and he said, 'Come on Pee Wee, let's go.'" She testified that she "saw another man running in the parking lot towards a red car." She said the two men running toward the car were younger and African-American. Ms. Bentley ran inside and her husband called 911. She testified that someone knocked forcefully on their door, but that they did not answer it. She also stated that she heard tires squealing and saw the red car leave the parking lot.

On cross-examination, Ms. Bentley acknowledged that, on the same night, she also saw a suspicious gray Buick or Cadillac that was parked in the parking lot and left running. She said that there was a female and at least one male in the gray car and that she did not remember if the car was still there when the red car left the parking lot. Ms. Bentley testified

that she thought the gray car belonged to someone who lived in an apartment on one of the lower levels of the complex.

Sergeant Joseph Winter of the Metropolitan Nashville Police Department testified that he responded to the shooting scene on October 12, 2005. He stated that he spoke with Ms. Bentley and Mr. Wells at the scene and that, based on the descriptions they provided and the nickname "Pee Wee," he searched records to find a possible match. Sergeant Winter testified that the Defendant had used the nickname "Pee Wee" before. He also stated that his investigation revealed that the Defendant had received a traffic ticket earlier in 2005 while driving a red Pontiac, a car fitting the description Ms. Bentley gave.

Sergeant Winter also testified that the person who knocked on the door during the robbery was Mr. Winkfield's brother, Marcus. On cross-examination, Sergeant Winter revealed that Mr. Musse owned a gray 1998 Chevy Lumina, similar to the other car Ms. Bentley described. He said the vehicle was stolen, but was recovered at the apartment complex a few days later. The only fingerprint, besides Mr. Musse's, that was recovered belonged to a cousin of Mr. Winkfield. He also testified that a .40 caliber bullet killed Mr. Musse.

Detective Chris Brennan of the Metropolitan Nashville Police Department testified that he arrived at the shooting scene at approximately 8:00 p.m. on the night of October 12, 2005, and began collecting evidence and photographing the area. He stated that Mr. Musse had already been transported from the scene by paramedics. However, he testified that there was blood on the concrete in the breezeway outside of Mr. Musse's apartment. He also stated that some of the victim's bloody clothing remained in the breezeway after the victim was removed by paramedics. Detective Brennan's photographs were shown to the jury.

Dr. Staci Turner, employed by the Davidson County Medical Examiner's office, performed an autopsy of Mr. Musse's body on October 13, 2005. She testified that there was a laceration on Mr. Musse's nose that was consistent with an injury caused by being pistol whipped. She stated that Mr. Musse had three gunshot wounds—one on the right earlobe, one on the right wrist, and one on his right upper chest—but explained that it was possible that all of those injuries were sustained from one single gunshot. Dr. Turner testified that Mr. Musse's cause of death was multiple gunshot wounds, and his manner of death was homicide.

The Defendant was arrested on December 20, 2005, following a police surveillance operation. He was seen driving a red Pontiac registered to his girlfriend, and a search of that vehicle revealed a MAC 9 assault rifle. Sergeant Winter testified that he believed the MAC 9 and AK-47 were similar styles of guns. He also explained that it was significant to find the

-4-

gun in a car the Defendant was driving because "the same style of weapon was described as being stolen on the night of the robbery when Mr. Musse was killed." At the Defendant's trial, Mr. Wells testified that he only saw the top of the gun that Mr. Winkfield brought into his apartment, but that the top of the gun recovered from the red Pontiac looked the same. After looking at pictures of the red Pontiac during the Defendant's trial, Ms. Bentley testified that it looked like the same car she saw leaving the parking lot of the apartment complex on October 12, 2005.

After the Defendant was arrested and given his Miranda[2] warnings, he waived his rights and was interviewed by Sergeant Winter and Detective David Achord. The jury watched a video of the interview during the Defendant's trial. At first, the Defendant said that he "wasn't involved" but, seconds later, he acknowledged being at the crime scene: "I went and I didn't know it was going down like that. I didn't know it was a robbery or nothing. I was coming to get some weed from the guys."

The Defendant admitted that he had a gun during the robbery and described it as a "little bitty .22." He stated that it was all black and belonged to one of his co-defendants. He said that his co-defendant handed him a gun as he got out of the car. He maintained that he did not know that his co-defendants intended to rob the men in the apartment and that he thought the gun was only for his protection. He stated that one of his co-defendants, Stephan Cason, initiated the robbery and was the one who pistol-whipped Mr. Musse. The Defendant said that he opened the door when someone knocked on it during the robbery, but when the person started to run, the Defendant ran after him. He stated that, while he was running, he heard a gunshot and then heard someone calling his nickname "Pee Wee." He testified that when he got to the car, his co-defendants were already waiting for him there. Throughout the interview, he denied being the person who shot Mr. Musse, but gave differing answers on which one of his co-defendants fired the shot.

The Defendant stated that the men took an ounce of "dope," two ounces of "weed," and "a hundred-something dollars" during the robbery. He also said that he and his co-defendants split the "dope" and the money. The Defendant denied that the gun found in the red Pontiac, at the time of his arrest, was the same gun that was stolen during the robbery. He stated that Stephan Cason kept Mr. Winkfield's gun.

Detective Achord and Sergeant Winter asked the Defendant about the robbery of a Mexican man, Raoul Buganda, which occurred earlier in the evening of October 12, 2005, at approximately 6:50 p.m. At the Defendant's trial, Sergeant Winter testified that Mr. Buganda was robbed only a few miles away from the scene of the shooting and estimated that

_____

[2] See Miranda v. Arizona, 384 U.S. 436, 479 (1966).

it would take less than five minutes to get from one location to the other. During his interview, the Defendant admitted being at the earlier robbery scene. He described how he and his co-defendants went to an apartment complex where they thought they could buy weed. He said that Mr. Buganda was in his truck in the parking lot and two of his co-defendants ran to either side of the truck and said, "Shut up. . . . [inaudible]." When asked what his co-defendants did next, the Defendant said, "Pulled the guns, I don't know. . . [inaudible]." At two subsequent times during the interview, the Defendant mentioned the incident and said, "Then they did that shit with the Mexican guy," and "[a]fter the Mexican shit happened . . . ." He said that his co-defendants did not split the proceeds from the Buganda robbery with him.

The Defendant testified in his own defense during his trial. He stated that he and his co-defendants went to the apartment complex where Mr. Musse lived to buy drugs. He said that he did not go over to the apartment with the intention to commit a robbery and that he did not shoot Mr. Musse. The Defendant explained that his girlfriend drove him and his co-defendants over to Mr. Musse's apartment complex, at Stephan Cason's direction. He said that when they got there, Stephen Cason got out of the car, spoke to someone in a gray car, and then proceeded toward the front of the building. He testified that Sidney Cason, also a co-defendant, asked him if he was going to come to the apartment with them. The Defendant explained that he went with them because he had already given them money to buy weed, he did not trust them, and he was worried they would "pull some weed out of my stuff." He testified that Sidney Cason said, "[I]f you nervous, man, just hold this so you can feel better," and handed him a .22 caliber gun, which he put in his pocket. He stated that there was a man standing outside of the apartment and that the man went into the apartment first, followed by Sidney Cason, then the Defendant, and then Stephan Cason. The Defendant testified that did not see if his co-defendants had pulled their guns on the man outside the apartment. However, he stated that when they got into the apartment, "that's when all the guns were drew out, I never pulled my gun out."

The Defendant further testified:

They were like "everybody against the wall," but I'm knowing they not talking to me, but I came with them, so I'm just figuring like, you know, I just been used, I was just used to drive them over here, so I stand off to the wall and all the guys are facing like the front of the wall away from the door and they going from room to room, grabbing stuff.

He stated that when someone knocked on the door, Stephan Cason instructed him to open it. He said that he ran out because he felt that it was his best chance to get away. While he was running, the Defendant heard a "POW." He said that when he got to the car, his co-

defendants were already there, still with guns in their hands, and said, "Let's go." He testified that he told them to get out of his car, but that they convinced him to drop them off where he picked them up earlier in the evening.

The Defendant testified that his co-defendants had a black bag and two small trash bags filled with clothes and video games they had taken from the apartment. He said that, before the robbery, he had given his co-defendants money to purchase weed and cocaine. He testified that he got the weed he paid for outside the apartment in the breezeway. However, they apparently gave him the cocaine he paid for sometime later after the robbery.[3] He also testified that the gun found in the red Pontiac when he was arrested was his gun and not the one taken in the robbery.

When the Defendant was asked why he stated, during his interview with police, that he and his co-defendants split the proceeds of the robbery, he said that he was scared, nervous, "high off drugs," and not totally in control of his actions during the interview. He explained, "I did not at all mean we divvied up everything that was took from the robbery, what I meant was I was given what I paid for initially before everyone got out of the car." He testified that he was not given any of the money, clothes, or cell phones taken from the robbery. He maintained that he was only given the amount of drugs for which he had already paid his co-defendants. When cross examined about the veracity of his statements to police, he said, "This is the truth I'm saying, some parts of it are sketchy, some parts are, you know, not exactly the truth, but most of all it's still going on the guidelines of what happened."

Regarding the robbery of Mr. Buganda, the Defendant testified that before he and his co-defendants went to Mr. Musse's apartment complex, they went to another apartment complex to get drugs from "a Mexican guy." He said that his co-defendants went up to a truck and got inside. He stated that he was "just being nosey" and started to go toward the truck. He testified that before he got to the truck, his co-defendants got out of the truck and started to run "in a slight jog" back to his car. He recalled that they said, "[C]ome on, let's go," and that he said, "[W]hat's wrong yall [sic]?" The Defendant testified, "I didn't—it wasn't until my knowledge after the fact that I knew that they robbed somebody. I kind of figured that something funny was going on, but it was just, I was just trying to get high, so." He stated that he did not intend on robbing Mr. Buganda and that he did not get any proceeds from the robbery.

The Defendant was originally charged, in count five of the indictment, with the aggravated robbery of Mr. Buganda. However, because Mr. Buganda did not cooperate with the police investigation and had moved to Mexico, the Defendant moved to dismiss count

---

[3] The record is unclear about the time frame within which he obtained the drugs.

five prior to his trial. Regarding proof for count five to be presented at trial, the trial court indicated that the State was only prepared to present testimony of an officer called to the scene of the Buganda robbery.[4] The trial court stated its intention to grant the Defendant's motion to dismiss count five because it found that the officer's testimony did not suggest a crime was committed and that there was "[in]sufficient corroborating evidence to allow that to go to the jury." However, the trial court stated that the portion of the Defendant's statement to police regarding Mr. Buganda's robbery was "admissible for the purposes of establishing possibly his mental state and things of this nature . . . " under Tennessee Rule of Evidence 404. The State then advised the court that it would "nolle" count five.

On July 22, 2008, a Davidson County jury convicted the Defendant of one count of first degree felony murder, one count of especially aggravated robbery, one count of aggravated robbery, and one count of aggravated kidnapping. He now appeals.


**Analysis**

**I. Sufficiency of the Evidence**

The Defendant contends that the State presented evidence insufficient to convict him of first degree felony murder, especially aggravated robbery, aggravated robbery, and aggravated kidnapping. He argues that he simply went to Mr. Musse's apartment complex to purchase drugs and had no intent to rob or harm anyone. The Defendant maintains that, despite his contrary statements to police, he did not share in the proceeds of the robbery.

Tennessee Rule of Appellate Procedure 13(e) prescribes that "[f]indings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt." A convicted criminal defendant who challenges the sufficiency of the evidence on appeal bears the burden of demonstrating why the evidence is insufficient to support the verdict, because a verdict of guilt destroys the presumption of innocence and imposes a presumption of guilt. See State v. Evans, 108 S.W.3d 231, 237 (Tenn. 2003); State v. Carruthers, 35 S.W.3d 516, 557-58 (Tenn. 2000); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). This Court must reject a convicted criminal defendant's challenge to the sufficiency of the evidence if, after considering the evidence in a light most favorable to the prosecution, we

---

[4] The record on appeal leads us to conclude that there was a hearing on this matter. Immediately before the trial began, the trial court stated, "Going to this issue of that was discussed Friday about what the [c]ourt would do on a JOA with count five." However, no transcript of the proceedings from "Friday" was included in the appellate record. The trial court then stated, "Based on the statement given by the defendant and, as I understand it, the only other testimony would be that a police officer was called out to the location of the victim's . . . ."

determine that any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); State v. Hall, 8 S.W.3d 593, 599 (Tenn. 1999).

On appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable and legitimate inferences which may be drawn therefrom. See Carruthers, 35 S.W.3d at 558; Hall, 8 S.W.3d at 599. A guilty verdict by the trier of fact accredits the testimony of the State's witnesses and resolves all conflicts in the evidence in favor of the prosecution's theory. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). Questions about the credibility of witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact, and this Court will not re-weigh or re-evaluate the evidence. See Evans, 108 S.W.3d at 236; Bland, 958 S.W.2d at 659. Nor will this Court substitute its own inferences drawn from circumstantial evidence for those drawn by the trier of fact. See Evans, 108 S.W.3d at 236-37; Carruthers, 35 S.W.3d at 557.

Tennessee statutes provide that "[a] person is criminally responsible for an offense committed by the conduct of another if: . . . (2) [a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense." Tenn. Code Ann. § 39-11-402(2). This statute codifies the longstanding common law theories of "accessories before the fact and aiders and abettors." Tenn. Code Ann. § 39-11-402, Sentencing Commission Comments. However, criminal responsibility is not itself a separate crime; rather, "[i]t is solely a theory by which the State may prove the defendant's guilt of the alleged offense . . . based upon the conduct of another person." State v. Lemacks, 996 S.W.2d 166, 170 (Tenn. 1999).

Under a theory of criminal responsibility, "[p]resence and companionship with the perpetrator of a felony before and after the commission of the offense are circumstances from which ones participation in the crime may be inferred." State v. Ball, 973 S.W.2d 288, 293 (Tenn. Crim. App. 1998). No particular act need be shown, and the defendant need not have played a physical role in the crime in order to be held criminally responsible for the crime. State v. Caldwell, 80 S.W.3d 31, 38 (Tenn. Crim. App. 2002). Rather, to be held criminally responsible for the acts of another, the defendant need only "associate himself with the venture, act with knowledge that an offense is to be committed, and share in the criminal intent of the principal in the first degree." State v. Maxey, 898 S.W.2d 756, 757 (Tenn. Crim. App. 1994); see also State v. Steven Nelorn Hampton, Jr., No. M2004-00704-CCA-R3-CD, 2005 WL 677279, at *5 (Tenn. Crim. App., Nashville, Mar. 24, 2005) (finding sufficient evidence to convict the defendant of especially aggravated robbery under a criminal responsibility theory because he admitted that he shared in the proceeds of the robbery, was present at the scene of the crime, and was with his co-defendants both before

and after the commission of the crime); State v. Summers, 159 S.W.3d 586, 593 (Tenn. Crim. App. 2004) (noting that there was sufficient evidence to convict the defendant of felony murder under a theory of criminal responsibility because testimony placed the defendant at the scene with a weapon in his hand, the defendant admitted he was there, and one of the victims was shot and killed during the robbery).

### A. First Degree Felony Murder
First degree felony murder is "[a] killing of another committed in the perpetration of or attempt to perpetrate any . . . robbery[.]" Tenn. Code Ann. § 39-13-202(a)(2). Our supreme court has stated that "[t]he killing may precede, coincide with, or follow the felony and still be considered as occurring 'in the perpetration of' the felony offense, so long as there is a connection in time, place, and continuity of action." State v. Buggs, 995 S.W.2d 102, 106 (Tenn. 1999). The mental state required for conviction of felony murder is the intent to commit the underlying felony offense; in this case, robbery. See Tenn. Code Ann. § 39-13-202(b). "Robbery is the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401(a).

The proof presented at trial showed that Mr. Musse was killed during the perpetration of a robbery. Mr. Wells testified that three armed men entered his apartment on the evening of October 12, 2005. He stated that all three men had guns, and that the intruders took cocaine, marijuana, money, and his cell phone from his pockets. He testified that they attempted to empty Mr. Musse's pockets, but that he resisted and was pistol whipped by one of the intruders. Mr. Wells testified that Mr. Musse subsequently attempted to get the gun from one of the men and that he heard a gunshot. Mr. Wells testified that Mr. Musse was shot in the breezeway outside of their apartment. Dr. Turner testified that Mr. Musse died from multiple gunshot wounds, but that all three of his wounds could have been caused by a single bullet. Detective Brennan stated that, when he got to the crime scene, he saw blood and the victim's bloody clothes in the breezeway outside of the victims' apartment. Thus, we believe that the evidence was sufficient to show that the robbery was closely connected in time and place to the killing and that there was no break in the continuity of action.

The trier of fact then had to determine whether the Defendant intended to commit the underlying robbery. The State presented evidence that the co-defendants committed another robbery, against Mr. Buganda, on October 12, 2005, before going to Mr. Musse's apartment. The Defendant testified that he was with his co-defendants at the scene of Mr. Buganda's robbery and that he "kind of figured that something funny was going on, but . . . was just trying to get high." The Defendant admitted to being at Mr. Musse's apartment with his co-defendants. Ms. Bentley also tied the Defendant to the scene by identifying his girlfriend's car as "looking like" the suspicious red car she saw on the night of October 12, 2005, and by testifying that she heard someone call the Defendant's nickname "Pee Wee." The Defendant

acknowledged that he was armed with a "little bitty .22" when he went into Mr. Musse's apartment with his co-defendants. Mr. Wells testified that each of the intruders had "covered" one of the three victims and that all of the men seemed to be working together. He also testified that none of the three intruders seemed reluctant to participate in the crime.

The State also presented evidence that the Defendant stated, in his initial interview with police, that he and his co-defendants split up the "dope" and money from the robbery. Mr. Wells testified that the top of the gun found in the red Pontiac the Defendant was driving looked the same as the top of Mr. Winkfield's gun, which was stolen during the robbery. Further, the Defendant acknowledged that he received marijuana and cocaine stolen from Mr. Musse's apartment, but argued that it was only the amount for which he had already paid his co-defendants. The Defendant acknowledged that he was in the presence and companionship of his co-defendants before and after the commission of the robbery. After reviewing the foregoing facts, we conclude that the State presented evidence sufficient to establish that the Defendant intended to commit the underlying robbery and that Mr. Musse was killed during the perpetration of that robbery. Therefore, the evidence was sufficient to convict the Defendant of first degree felony murder beyond a reasonable doubt. The Defendant is not entitled to relief on this issue.

### B. Especially Aggravated Robbery of Mr. Musse

Especially aggravated robbery is robbery that is "(1) [a]ccomplished with a deadly weapon; and (2) [w]here the victim suffers serious bodily injury." Tenn. Code Ann. § 39-13-403(a). The serious bodily injury required for a conviction of especially aggravated robbery must "precede or be concomitant to or contemporaneous with the taking of property." State v. Owens, 20 S.W.3d 634, 637 (Tenn. 2000)).

As discussed above, testimony at trial revealed that each of the three intruders possessed a gun during the robbery at Mr. Musse's apartment. The Defendant admitted that he was present at the apartment and that he had a gun during the robbery. The men started to empty Mr. Musse's pockets, but Mr. Musse resisted and one of the intruders pistol whipped him in the face in order to get him to calm down. Mr. Musse was forced to stay on his knees, up against the wall. One of the intruders started going through the apartment to look for items of value. The Defendant testified that his co-defendants ultimately left the apartment with three bags full of clothes and video games.

When there was a knock on the door during the robbery, and the door was opened, Mr. Winkfield was able to escape. Mr. Wells testified that two of the intruders also ran out of the apartment, perhaps after the person who knocked on the door. He also testified that the third intruder and Mr. Musse left the apartment right before him and that they struggled in the breezeway by the apartment. Mr. Wells heard a gunshot and saw his roommate fall to the

ground. The gunman then ordered Mr. Wells not to move. Mr. Musse suffered serious bodily injury during the robbery, as he was shot at least once and had gunshot wounds on his right earlobe, right wrist, and right upper chest. Dr. Turner testified that Mr. Musse's death was caused by the multiple gunshot wounds. We therefore conclude that the State presented evidence sufficient to establish that the Defendant was guilty of especially aggravated robbery beyond a reasonable doubt. The Defendant is not entitled to relief on this issue.

### C. Aggravated Robbery of Mr. Wells

Aggravated robbery is robbery that is "[a]ccomplished with a deadly weapon." Tenn. Code Ann. § 39-13-402(a)(1).

Mr. Wells testified that three men armed with guns entered his apartment on October 12, 2005. The Defendant admitted that he was present at the apartment and that he had a gun during the robbery. Mr. Wells stated that the intruders ordered him to put his hands up and then took cocaine, marijuana, money, and his cell phone from his pockets. He testified that he was forced to stay on his knees against the wall and that one of the intruders started going through his apartment looking for items of value. The Defendant testified that his co-defendants took three bags full of clothes and video games from the apartment. We therefore conclude that the State presented evidence sufficient to establish that the Defendant committed the crime of aggravated robbery beyond a reasonable doubt. The Defendant is not entitled to relief on this issue.

### D. Aggravated Kidnapping of Mr. Winkfield

Aggravated kidnapping is false imprisonment that is committed "[w]hile the defendant is in possession of a deadly weapon or threatens the use of a deadly weapon." Tenn. Code Ann. § 39-13-304(a)(5). False imprisonment occurs when a person "knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty." Tenn. Code Ann. § 39-13-302(a).

The State presented evidence that when Mr. Winkfield came back to the apartment, he had his hands up and there were three men with guns standing behind him. Mr. Wells recalled that one of the men held a gun to Mr. Winkfield's head. The Defendant admitted that he was present at the apartment and that he had a gun during the robbery. Ms. Bentley also tied the Defendant to the scene by identifying his girlfriend's car as looking like the suspicious red car she saw on the night of October 12, 2005, and by testifying that she heard someone call the Defendant's nickname "Pee Wee." Mr. Wells also testified that, later in the robbery, the intruders found Mr. Winkfield's gun and that they took him into the bathroom. Mr. Wells testified that he thought they were going to shoot Mr. Winkfield because he lied about not having a gun. The testimony revealed that when someone knocked on the apartment door during the robbery, one of the intruders was with Mr. Winkfield in the

bathroom. However, Mr. Winkfield was able to escape when the apartment door was opened. We conclude that the State presented evidence sufficient to establish that the Defendant, or someone for whom he was criminally responsible, confined Mr. Winkfield so as to interfere substantially with his liberty and that the confinement occurred when the Defendant, or someone for whom he was criminally responsible, possessed a deadly weapon. Therefore, the evidence was sufficient to convict the Defendant of aggravated kidnapping beyond a reasonable doubt. The Defendant is not entitled to relief on this issue.

## II. Testimony Regarding Mr. Buganda's Robbery

The Defendant contends that the trial court erred when it allowed testimony to be presented about Mr. Buganda's robbery, a charge that the trial court dismissed prior to the beginning of the trial. The Defendant argues that the testimony should have been excluded under Tennessee Rule of Evidence 404(b). However, we find that this issue has been waived.

If a trial court rules to admit evidence, a party must timely enter a specific objection on the record in order to preserve a claim of error for appeal. See Tenn. R. Evid. 103(a)(1). There is no indication in the record on appeal that the Defendant made a contemporaneous objection at trial to testimony regarding the robbery of Mr. Buganda. Relief is not available to a party who is responsible for, or fails to take action to prevent, an error. See Tenn. R. App. P. 36(a).

Tennessee Rule of Evidence 103(a) also states, "Once the court makes a definitive ruling on the record admitting or excluding evidence, either at or before trial, a party need not renew an objection or offer of proof to preserve a claim of error for appeal." It is possible that the Defendant objected to this evidence before trial, however, the record on appeal is insufficient to lead us to that conclusion.[5] "When a party seeks appellate review there is a duty to prepare a record which conveys a fair, accurate and complete account of

---

[5] Again, we point out that the record is unclear about the issue relating to evidence of the robbery of Mr. Buganda. The beginning of the trial transcript alludes to a discussion that was held on "Friday" about dismissing count five of the indictment, the robbery of Mr. Buganda. However, a transcript of Friday's proceeding was not included in the record on appeal. From the trial transcript, there is no indication that, in the event the trial court dismissed count five of the indictment, the Defendant previously objected to the mention of Mr. Buganda's robbery. After the trial court stated that it was going to grant the motion to dismiss count five, it added, "Let me clarify though that his statement is admissible for the purposes of establishing possibly his mental state and things of this nature, so it's not like it's excluded by any means." The Assistant District Attorney then asked, "Okay, so under 404, Your Honor, we can still play that portion of the statement discussing the Raoul Buganda robbery?" The trial court answered, "Yes, and I'll give a limiting instruction on how they use that; it goes to his mental state."

-13-

what transpired with respect to the issues forming the basis of the appeal." <u>State v. Ballard,</u> 855 S.W.2d 557, 560 (Tenn. 1993).  Our supreme court has also stated, "Where the record is incomplete and does not contain a transcript of the proceedings relevant to an issue presented for review . . . an appellate court is precluded from considering the issue." <u>Id.</u> at 560-61.  Therefore, this issue is waived.

### Conclusion

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial court.

_____
DAVID H. WELLES, JUDGE