# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE October 8, 2013 Session

## STATE OF TENNESSEE v. PHILLIP MATTHEW BURGESS

### Appeal from the Circuit Court for Marshall County No. 2012-CR-1Robert Crigler, Judge

---

### No. M2013-00252-CCA-R3-CD - Filed January 28, 2014

---

The defendant, Phillip Matthew Burgess, appeals his Marshall County Circuit Court jury convictions of first degree premeditated murder, attempted first degree murder, and aggravated assault, raising a variety of issues for review, each of which is addressed to the trial court's denial of his post-trial motions to compel and his motion for new trial. Discerning no reversible error, we affirm the judgments of the trial court.

### Tenn. R. App. P. 3; Judgment of the Circuit Court Affirmed

JAMES CURWOOD WITT, JR., J., delivered the opinion of the Court, in which ROBERT W. WEDEMEYER and ROGER A. PAGE, JJ., joined.

Robert A. Dalton, Lewisburg, Tennessee (on appeal); and Michael J. Collins, Assistant District Public Defender (at trial), for the appellant, Phillip Matthew Burgess.

Robert E. Cooper, Attorney General and Reporter; Rachel Harmon, Assistant Attorney General;Charles Crawford, District AttorneyGeneral; and WeakleyE.Barnard and Michael D. Randles, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

The convictions in this case relate to the defendant's shooting and killing Joey Perryman,shooting and wounding Jordan Beavers,and shooting atbut missing Hunter Keel. The defendant admitted doing the shooting, but he claimed that he acted in self-defense.

At trial, Jeanette Belew testified that she came to Lewisburg in August 2011 looking for a place for her and her 10-month-old daughter to stay. A friend introduced her to the defendant, who agreed to let them stay with him in his one-bedroom apartment. Ms. Belew testified that during the time she stayed with the defendant, he introduced her to his father and stepmother and asked her

to pretend to be his girlfriend. She said that she agreed and that she was not bothered by the defendant's request. When the defendant asked her to enter into a romantic relationship, she declined. She said that the defendant was upset but did not ask her to leave.

Within a couple of days, however, Ms. Belew became uncomfortable because of the defendant's "attitude," saying that he "was not talking sensible." As a result, she contacted Harold Caldwell, a man with whom she had previously lived, and asked if she could stay with him. Mr. Caldwell, who was working out of state at the time, agreed to allow Ms. Belew and her daughter to stay in his apartment. Ms. Belew said that the defendant helped her pack and that an ex-boyfriend drove her to Mr. Caldwell's apartment, which was apartment seven of the Martin Street Apartments. She moved into apartment seven on August 6, 2011, and that same evening, she encountered Mr. Perryman, whom she knew from having previously lived in Lewisburg, and his sister, Traci Beavers, as well as Ms. Beavers' son, Jordan Beavers, and nephew, Hunter Keel. The group made plans to congregate at apartment seven on the following day to eat chicken prepared by Ms. Belew.

On August 7, 2011, Ms. Belew asked her ex-boyfriend to take her daughter for the day, and he arrived sometime around noon. Shortly thereafter, Mr. Perryman and Mr. Beavers brought the chicken for Ms. Belew to prepare and promised to return later. Ms. Belew said that she cooked the chicken and then got into the shower. She recalled that throughout the morning, the defendant sent her text messages accusing her of stealing Xanax from him. In addition, he told her that he would bring her mail to her new apartment. Ms. Belew testified that while she was in the shower, she heard a knock at the door and said, "Hold on a minute; I am in the shower." She said that when she opened the bathroom door to walk toward the front door, she saw the defendant standing in the living room holding a cellular telephone, some mail, and a beer. Ms. Belew claimed that she was surprised to see the defendant because she had not told him where she lived.

According to Ms. Belew, she cursed the defendant and told him to leave, but he sat down at the kitchen table instead. She said that as she continued to curse the defendant, Messrs. Perryman and Beavers arrived. When Mr. Perryman asked what was going on, she replied, "I can't get this MF'er out." She testified that at that point, Mr. Perryman "just cuts in and starts cussing, You need to get out; this ain't even her place; you need to get the hell out." She said that the defendant never said anything during the encounter and instead "walked out calmly."

Ms. Belew testified that after the defendant left, she asked Mr. Perryman and Mr. Beavers to remain in the apartment while she finished her shower. She said that while she was in the shower, she heard another knock at the door and then heard the defendant say, "'F*** you, mother f*****s'" followed shortly by gunshots. Ms. Belew said that she did not realize that what she had heard were gunshots until Mr. Beavers came into the bathroom bleeding from a gunshot wound to his chest. She recalled that Mr. Beavers, who was trying to hide in the closet, said, "'Joey is out there, and he got shot.'" She then heard Mr. Perryman calling for help, and she tried to open the bathroom door but could not get the doorknob to turn. Mr. Beavers then used an electric guitar he found in the closet to smash a hole in the bathroom door. She said that Mr. Beavers went through the door first, and she followed. Mr. Beavers left the apartment while she

-2

went to check on Mr. Perryman, who told her that he could not breathe. Ms. Belew said that she telephoned 9-1-1.

During cross-examination, Ms. Belew acknowledged that she initially told police that the defendant had driven her to apartment seven and helped her to move into the apartment. She said that she changed her statement on the following day and acknowledged that she blamed her initial mistake on the fact that she had consumed too much beer on August 7, 2011.

Jordan Beavers, who was 16 years old at the time of the June 2012 trial, testified that he and his cousin, Hunter Keel, went to apartment seven on August 7, 2011, with his uncle, Mr. Perryman, to drop off chicken that Ms. Belew had agreed to prepare. He said that they left but returned a short time later to find Ms. Belew wrapped in a towel and seated at the table talking to a heavyset man wearing a voluminous Hawaiian-print shirt. Mr. Beavers recalled that Mr. Perryman asked the man, whom he identified as the defendant, why he was in apartment seven, and the defendant replied that he had delivered Ms. Belew's mail. At that point, Mr. Perryman cursed the defendant and told him to leave. According to Mr. Beavers, the defendant "just said, 'Okay,'" and left. He said that no physical altercation occurred between the men.

Mr. Beavers testified that he and Mr. Keel sat on the bed while Mr. Perryman sat at the table drinking beer and Ms. Belew took a shower. At some point, they heard a knock, and Mr. Perryman answered the door. Mr. Beavers said that when Mr. Perryman saw the defendant standing at the door, Mr. Perryman cursed the defendant and asked why he had returned. The defendant replied that he had forgotten something, and then he raised a gun and fired it at Mr. Perryman, who fell into the kitchen counter. After the defendant fired the first shot, he came into the apartment, and Mr. Beavers took a step back. The defendant then pointed the gun at Mr. Beavers and fired. Not realizing he had been shot, Mr. Beavers ran into the bathroom, where he hid in a closet. While he was in the bathroom, he heard Mr. Perryman say, "Don't kill me; I have a daughter." At that point, he and Ms. Belew tried to get out of the bathroom but could not open the door. Mr. Beavers took an electric guitar that he found in the closet and used it to smash the bathroom door. Once through the door, Mr.

Beavers saw Mr. Perryman lying in the floor.

Mr. Beavers said that he did not stop to check on Mr. Perryman, but instead he left the apartment and saw his mother and girlfriend, Isabella Jacobson, waiting in his mother's car. He said that he got into the car with the women, and his mother drove toward the hospital. He recalled that when they were stopped at a stoplight, his mother flagged down a passing police officer and told him about the shooting. He said that the officer called an ambulance and that he was transported to Vanderbilt Hospital, where he was treated for a through-and-through gunshot wound to his upper left chest. He later learned that Mr. Perryman had succumbed to his injuries.

Although Mr. Beavers denied during direct examination that anyone had threatened

-3

the defendant, he admitted on cross-examination that Mr. Perryman said, "Get the f*** out. Before I beat your ass." He also testified that Ms. Belew was not arguing with the defendant when Mr. Beavers arrived at the apartment but was instead seated at the table talking to the defendant. He said that Ms. Belew initially told him not to call the police after the shooting.

Fourteen-year-old Hunter Keel testified that on August 7, 2011, he went with Ms. Beavers, Mr. Beavers, and Mr. Perryman to purchase chicken for Ms. Belew to prepare for the group. After dropping the chicken off with Ms. Belew, Messrs. Keel, Beavers, and Perryman returned to Ms. Beavers' apartment. A short time later, they went to apartment seven and found Ms. Belew seated at the table talking to the defendant. Mr. Keel said that Mr. Perryman immediately cursed the defendant and told the defendant "to get out," explaining that Mr. Perryman "is never nice to nobody." He recalled that the defendant got up and walked out without comment. Thereafter, he remained in the apartment with Mr. Perryman and Mr. Beavers while Ms. Belew got into the shower.

A short time later, they heard a knock at the door, and Mr. Perryman answered. When Mr. Perryman saw the defendant, he said, "I thought I told you to leave." The defendant "hesitated, but he said, I forgot something." Mr. Keel said that at that point, the defendant "pulled a gun out from like behind his wallet . . . and held it to his waist." The defendant then shot Mr. Perryman, and Mr. Keel "took off to the door and shut the door and got on the ground." He said that after Mr. Perryman fell to the floor, the defendant stepped inside the apartment, and Mr. Beavers ran into the bathroom and slammed the door. Mr. Keel ran out the front door. Mr. Keel said that when he heard another gunshot, he believed that the defendant was shooting at him, so he ran quickly along a circuitous route to Ms. Beavers' apartment. He recalled that he watched apartment seven until police arrived, and then he went back to the apartment. After speaking with a police officer, he saw Mr. Beavers in an ambulance.

Mr. Keel admitted providing a somewhat different statement to police on August 7, 2011, saying that he "might have been dramatic" in the first telling. He acknowledged that he told police that he attacked the defendant with an object and that the defendant had chased him out of the apartment and shot at him.

Nolan Pippen, a resident of the Martin Street Apartments, said that at approximately 1:00 p.m., he saw "a very large man, very large proportioned man, who was unusual looking, so [he] watched him" go into apartment seven. Mr. Pippen recalled that the man wore "a big flowery shirt, the size of a tent." He said that, a few minutes later, the man left and walked down the sidewalk. While dozing in his recliner, Mr. Pippen heard gunshots and then saw "a young white gentleman, teenager" run out of apartment seven "like he was running a 100-yard dash." Mr. Pippen telephoned 9-1-1.

Sixteen-year-old Isabella Jacobson testified that as she prepared to walk from Ms. Beavers' apartment to apartment seven to eat chicken with Ms. Belew, she saw the defendant walk to the door of apartment seven and knock. She said that she saw someone open the door, saw the

-4-

defendant's hand go up, and then heard gunshots. The defendant then went inside the apartment, and Mr. Keel ran out. Ms. Jacobson alerted Ms. Beavers to the situation, and the women got into Ms. Beavers' car and drove toward the parking lot of the Martin Street Apartments. On their way, they saw the defendant, and Ms. Beavers asked him, "Did you just shoot my son and my brother?" The defendant responded, "No, I don't know what you are talking about."

The women continued to the Martin Street apartments, and Ms. Jacobson walked into apartment seven. Inside, she saw broken glass and spilled beer on the floor. Mr. Perryman, who was on the floor near the back door holding his side, said, "It is safe; you can come out. I am shot; I need help." She also saw a broken electric guitar on the floor and observed a large hole in the bathroom door. When she looked through the hole, Ms. Jacobson saw Mr. Beavers and Ms. Belew inside the bathroom. At that point, Mr. Beavers came out of the bathroom, but Ms. Belew did not. About that time, Ms. Beavers came into the apartment and saw that Mr. Beavers had been shot. Once the women realized that Mr. Beavers had been shot, they got into Ms. Beavers' car to drive to the hospital. On their way, they flagged down a police officer, who called for an ambulance for Mr. Beavers.

Lewisburg Police Department Sergeant Jerry Broyles responded to the call of shots fired at the Martin Street Apartments. While en route to the scene, Sergeant Broyles was flagged down by Ms. Beavers. Sergeant Broyles stayed until another officer arrived to coordinate care for Mr. Beavers, and then he drove to the Martin Street Apartments. At the scene, he observed Ms. Belew standing in the doorway wrapped in a towel. She told him that the defendant had shot Mr. Perryman and Mr. Beavers and that he had left the area. Sergeant Broyles went to Mr. Perryman, who said, "I have been shot; don't let me die."

After Mr. Perryman was taken from the apartment by emergency personnel, Sergeant Broyles telephoned a detective and secured the scene. While doing so, he received a report that the defendant had been seen, and he drove to the location described and found the defendant sitting inside his vehicle. He ordered the defendant out of the car, and the defendant complied. Shortly thereafter, Lewisburg Police Department Officer Russ Grubbs arrived and helped place the defendant in custody. Sergeant Broyles made arrangements for the defendant's vehicle to be towed to the police department. While making the arrangements, Officer Grubbs pointed out a Hawaiian-print shirt and a handgun inside the defendant's vehicle.

Lewisburg Police Department Detective James Johnson testified that after performing a cursory inspection of the scene and speaking to the witnesses there, he returned to the police department to meet with other detectives. He and Marshall County Sheriff's Department Detective Scott Braden provided the defendant with *Miranda* warnings, and, after the defendant waived his constitutional rights, the two detectives interviewed him. The one-hour audio recording of the defendant's statement was played for the jury. In addition to the audio-recorded statement, the defendant provided a handwritten statement. In that statement, the defendant said that a friend brought "some girl" to his apartment who needed a place to stay. He said that the girl stayed with him from Sunday to Friday and then left with "no goodbye or anything." The defendant said that he

-5-

called the girl, but when she would not answer, he asked a friend where she had gone. He said he went to that location, and a maintenance man told him where she was staying. He knocked on the door, and the girl told him to come in and that she was in the shower. When he went inside, the two of them sat at a table discussing "forgiveness." The defendant described what happened next:

> Then some bad [M]exicans came and saw me the[y] said I was a FN
> cop and the[y] was going to kick my ass and kill me because I'm and
> [sic] pig he came at me with a beer bottle and called me more names
> then the others came at me the girl disappeared I put out my HIP380
> cocked it and it did not matter they was going to kill me I shot at the
> . . . wall and the bathroom wall door area not aiming at anyone then
> I left and some chick called the cops.

Doctor Adele Lewis testified that Mr. Perryman suffered a single gunshot wound that entered the right side of his abdomen and exited the left side of his back. The bullet broke Mr. Perryman's right 10th rib and then "entered the liver . . . . [t]hen it continued through towards the back of the body and injured the right kidney. Then it injured the muscles of the left side of the lower part of the back before it exited the skin on the left side of the back." She testified that the injuries to Mr. Perryman's liver and kidneys would have been capable of causing death, as would the significant amount of internal bleeding Mr. Perryman suffered as a result of the gunshot wound. She acknowledged during crossexamination that Mr. Perryman had alcohol, marijuana, and methadone in his system at the time of his death.

At the conclusion of this testimony, the State rested. After a full *Momon* colloquy, the defendant elected not to testify, saying, "The statement made with the audiotape was good enough . . . ." The defendant also chose not to present any proof. Based upon this evidence, the jury convicted the defendant as charged of the firstdegree premeditated murder of Mr. Perryman, the attempted first degree murder of Mr. Beavers, and the aggravated assault of Mr. Keel. The jury acquitted the defendant of the aggravated assault of Ms. Belew.

The defendant filed a timely but unsuccessful motion for new trial followed by a timely notice of appeal. In this appeal, the defendant presents a number of issues for review. The primary thrust of the issues, however, is that the State failed to disclose certain evidence, that the trial court made various errors regarding the presentation of evidence at the hearing on the motions to compel this evidence and on the motion for new trial, and that the trial court erred by denying the motions to compel.[1] The defendant also argues that the trial court erred by holding that impeachment evidence could not qualify as newly discovered evidence and by refusing to permit an offer of proof regarding the alleged newly discovered evidence. Finally, he claims that the cumulative effect of

---

[1]

The trial court's denial of the motions to compel was the subject of the defendant's unsuccessful bid at an extraordinary appeal pursuant to Tennessee Rule of Appellate Procedure 10.

these errors prohibited him from receiving a fair trial. The defendant does not mount any challenge to the conduct of his actual trial.

## I. Failure to disclose

The defendant's primary complaints in this appeal center on his claim that the State inappropriately failed to disclose various items of evidence and that the trial court erred by denying his post-trial motions to compel production of the same.

Despite that the defendant filed two amorphous post-trial motions to compel that did not appear to be based on either the rules of criminal procedure or the tenets of *Brady v. Maryland*, the fact remains that those are the only two avenues by which he can claim entitlement to any of the evidence he desires. Accordingly, we will examine the defendant's claims to the evidence under each of these established rubrics to determine whether the trial court erred by refusing to compel the State to disclose the information requested by the defendant.

## A. Rule 16

"There is no constitutional right to general discovery in a criminal case." *State v. Schiefelbein*, 230 S.W.3d 88, 147 (Tenn. Crim. App. 2007) (citing *Pennsylvania v. Ritchie*, 480 U.S. 39 (1987); *Weatherford v. Bursey*, 429 U.S. 545 (1977)). Instead, the discovery of evidence by a criminal defendant is governed primarily by the Tennessee Rules of Criminal Procedure. Specifically, Criminal Procedure Rule 16(a) provides in pertinent part:

(a) Disclosure of Evidence by the State.

(1) Information Subject to Disclosure.

(A) Defendant's Oral Statement.

Upon a defendant's request, the state shall disclose to the defendant the substance of any of the defendant's oral statements made before or after arrest in response to interrogation by any person the defendant knew was a law-enforcement officer if the state intends to offer the statement in evidence at the trial;

(B) Defendant's Written or Recorded Statement.

Upon a defendant's request, the state shall disclose to the defendant, and make available for inspection, copying, or photographing, all of the following:

(i) the defendant's relevant written or recorded statements, or copies thereof, if:

(I) the statement is within the state's possession,custody, or control; and

(II) the district attorney general knows-or through due diligence could know-that the statement exists; and

(ii) the defendant's recorded grand jury testimony which

relates to the offense charged.

. . . .

(F) Documents and Objects.

Upon a defendant's request, the state shall permit the defendant to inspect and copy or photograph books, papers, documents, photographs, tangible objects, buildings, or places, or copies or portions thereof, if the item is within the state's possession, custody, or control and:

(i) the item is material to preparing the defense;

(ii) the government intends to use the item in its case-in-chief at trial; or

(iii) the item was obtained from or belongs to the defendant.

(G) Reports of Examinations and Tests.

Upon a defendant's request, the state shall permit the defendant to inspect and copy or photograph the results or reports of physical or mental examinations, and of scientific tests or experiments if:

(i) the item is within the state's possession, custody, or control;

(ii) the district attorney general knows-or through due diligence could know-that the item exists; and

(iii) the item is material to preparing the defense or the state intends to use the item in its case-in-chief at trial.

(2) Information Not Subject to Disclosure.

Except as provided in paragraphs (A), (B), (E), and (G) of subdivision (a)(1), this rule does not authorize the discovery or inspection of reports, memoranda, or other internal state documents made by the district attorney general or other state agents or law enforcement officers in connection with investigating or prosecuting the case. Nor does this rule authorize discovery of statements made by state witnesses or prospective state witnesses.

Tenn. R. Crim. P. 16(a)(1)-(2).

Initially, we note that the defendant did not endeavor to have any of the requested evidence placed into the record under seal or otherwise, and, as such, our ability to properly evaluate his claim to any of the evidence is severely hampered. *Schiefelbein*, 230 S.W.3d at 148. Any claim for relief pursuant to Rule 16 is further hampered by the absence in the appellate record of any pretrial request for discovery pursuant to Rule 16. The appellant bears the burden of preparing an adequate record on appeal, *see State v. Ballard*, 855 S.W.2d 557, 560 (Tenn. 1993), which includes the duty to "have prepared a transcript of such part of the evidence or proceedings as is necessary to convey a fair, accurate and complete accountof whattranspired with respectto those issues thatare the basesof appeal." Tenn. R. App. P. 24(b). If the appellant fails to file an adequate record, this court must presume the trial court's ruling was correct. *See State v. Richardson*, 875 S.W.2d 671, 674 (Tenn. Crim. App. 1993).

The provisions of Rule 16 are triggered only by the request of a defendant. If the defendant failed to request these items via a Rule 16 motion filed prior to trial, he cannot establish a violation of the rules of discovery. That being said, even if we treat the defendant's post-trial motions to compel as requests for discovery under Rule 16, he is not entitled to the evidence he seeks. We will discuss each item in turn.

*1. Statement of the Defendant Communicated to Jailers*

The defendant moved the trial court to compel the State to disclose "the substance of communications between [the defendant] and agents of the State regarding [the defendant's] mental health." At the hearing on his motions to compel, the defendant testified that he was transported by two jailers to a mental health facility in the days following his arrest and before he had obtained counsel. He claimed that during transit, he told the jailers that he saw a "shadow demon" seated across from him in the rear of the transport van. He also claimed that, once at the mental health facility, he told a "lady" about his seeing "shadow demons" and that he believed the

two jailers were within earshot when he made the revelation. The defendant did not testify or otherwise present any proof that either conversation was memorialized in writing.

First, the record establishes that the defendant failed to make reasonable efforts to obtain the statements made to or in the presence of the jailers or proof thereof before making the request via a post-trial motion to compel. "The [S]tate is not obliged to furnish the appellant with information, evidence, or material which is available or accessible to him or which he could obtain by exercising reasonable diligence." *State v. Dickerson*, 885 S.W.2d 90, 92 (Tenn. Crim. App. 1993). The defendant did not attempt to subpoena either of the jailers despite that he knew their names and where they worked. The evidence could have been available and accessible to the defendant via the usual compulsory process. In consequence, the State was not obliged to furnish the defendant with his oral statement to the jailers or the statement made in the presence of the jailers in the absence of his exercising reasonable diligence to obtain either.

Second, as indicated, the defendant did not testify that either statement was memorialized in writing or via audio or video recording. Rule 16 provides for discovery of the defendant's oral statements made "in response to interrogation by any person the defendant knew was a law-enforcement officer if the state intends to offer the statement in evidence at the trial." Here, the defendant did not testify that he made the revelations to his jailers or to the "lady" at the mental health facility in response to interrogation. *See* Tenn. R. Crim. P. 16, Advisory Comm'n Comments ("Under section (a)(1)(A), the commission originally provided that the defendant might obtain all of his or her statements, whether made to a law-enforcement official or to a lay witness. However, this was amended to conform to the federal rule, being limited by the language, 'in response to interrogation by any person then known to the defendant to be a law-enforcement officer.'"). Additionally, because the defendant filed his motion after the conclusion of his trial, he cannot establish that the State intended to offer the statements as evidence "at the trial." Indeed, the State offered only two statements of the defendant at trial, one that was recorded in writing and one that was audio recorded. He does not complain that the State failed to disclose either of those statements before offering them at trial. Under these circumstances, Rule 16 does not avail the defendant of entitlement to the statements he made to the jailers or in their presence.

### 2. Transportation Records

The defendant also moved the court to compel the State to disclose "the transportation of [the defendant] to a mental health facility" and "the records and documents resulting from the State's transportation of [the defendant] to a mental health facility." The record does not clearly establish exactly what the defendant wanted the State to turn over, but we presume that the defendant was referring to the records of the defendant's transportation via jail van from the jail to the mental health facility.

Again, the defendant failed to establish that he exercised any diligence, let alone reasonable

-10

diligence, to obtain the transportation records from the jail. *See Dickerson*, 885 S.W.2d at 92. Presumably, the transportation records would have been public records subject to inspection and review. *See* T.C.A. § 10-7-503(a)(1)(A). Furthermore, the defendant did not show that he attempted to subpoena the records from the jail.

Moreover, Rule 16 does not require disclosure of this information by the State. The only portion of Rule 16 that could potentially apply to the requested records would be subsection (a)(1)(F), which provides for the disclosure of "papers [and] documents" if they are "within the state's possession, custody, or control and . . . the item is material to preparing the defense; . . . the government intends to use the item in its case-in-chief at trial; or . . . the item was obtained from or belongs to the defendant." Tenn. R. Crim. P. 16(a)(1)(A). Clearly, the transportation records were not used in the State's case-in-chief and did not belong to the defendant. Thus, Rule 16 does not entitle the defendant to discovery of the transportation records unless he can show that they are material to preparing his defense. Based upon the record before us, the defendant failed to make a showing that the mere fact that he was transported from the jail to a mental health facility following his arrest was material to his defense. To the extent that the defendant's motion to compel the transportation records can be seen as a request under Rule 16, the defendant is not entitled to relief.

### 3. Telephone Calls from the Jail

The defendant moved the trial court to compel the State to disclose "the recordings of [the defendant's] telephone conversations regarding [the defendant's] mental health." The defendant testified that he made a number of telephone calls to members of his family, particularly his stepmother, and that, during those calls, he spoke about seeing "shadow demons." The substance of these conversations was clearly available and accessible to the defendant because the telephone calls were made to members of the defendant's own family. Moreover, the defendant did not attempt to obtain the recordings of the telephone conversations by subpoena. As such, the trial court did not err by denying his request. *See Dickerson*, 885 S.W.2d at 92.

### 4. Results of Mental Health Examination

The defendant also moved the trial court to compel the State to disclose the results of a mental health examination of the defendant conducted "by a female mental health professional who was procured by and acting at the behest of the State" and witnessed by the two jailers who transported the defendant to the mental health facility.[2] Again, the defendant testified at the hearing

---

[2]

From the parties' arguments at the hearings on the defendant's various motions, it appears that the defendant underwent a forensic mental examination prior to trial and that he was declared competent to stand trial. No record of the examination or the results thereof were exhibited at the hearings on the motions to compel or the motion for new trial. A letter from Cornerstone was exhibited to the sentencing hearing by the defendant's trial counsel. That letter established that the defendant was deemed competent to stand trial, that

-11

on the motions to compel that he was taken to a mental health facilityshortly after his arrest and that, at the facility, he reported to "a lady" that he was seeing shadow demons. He did not testify that he was subjected to any mental health examination or evaluation or that he completed any tests during this claimed excursion to a mental health facility. Because no proof existed to establish that the defendant underwent a mental health examination at that time, the trial court did not err by refusing to compel the State to disclose the results thereof.

Moreover, Rule 16 requires disclosure of the results of mental health examinations of the defendant only when they are "within the state's possession, custody, or control; . . . the district attorneygeneral knows-or through due diligence could know-that the item exists; and . . . the item is material to preparing the defense or the state intends to use the item in its case-in-chief at trial." Tenn. R. Crim. P. 16(a)(1)(G). Assuming that the alleged examination results were within the State's custody or control and that the district attorney general knew that they existed, the defendant has failed to establish that the State intended to use the item in its case-in-chief or that they were material to preparing his defense. Consequently, the trial court did not err by denying his motion to compel this evidence according to the terms of Rule 16.

### 5. *Ms. Belew's Statements to Police About the Defendant's Mental Health*

The defendant also moved to compel the State to disclose Ms. Belew's statements to police concerningthe defendant's mental health, specificallyher statement that the defendant told her that he saw "shadow demons." We mayeasilydispense with this claim under Rule 16 because that Rule does not "authorize discovery of statements made by state witnesses or prospective state witnesses." Tenn. R. Crim. P. 16(a)(2).

### B. Due Process

As the Advisory Commission comments to Rule 16 point out, that Rule "is not the exclusive procedure for obtaining discovery, since discovery required by due process is not expressly structured into the rule." Tenn. R. Crim. P. 16, AdvisoryComm'n Comments. The defendant, relying heavily upon *State v. John Cote and Sarah Cote In re: Dr. Sandra Elkins*, No. E2008-02483-CCA-R9-CD (Tenn. Crim. App., Sept. 28, 2010), claims that general principles of due process entitle him to discovery of the requested evidence. That case, however, has been designated "not for citation" by our supreme court, *see State v. John Cote and Sarah Cote In re: Dr. Sandra Elkins*, No. E2008-02483-SC-R11-CD (Tenn. Apr. 18, 2011) (Order) ("The opinion of the Court of Criminal Appeals is designated 'Not For Citation' in accordance with Supreme Court Rule 4(E). Although we agree with the Court of Criminal Appeals that the trial court erred by ordering an in camera review of the requested information, we do not endorse the standards adopted by the Court of Criminal Appeals."), and, as such lacks any precedential authority, *see*

---

he was not experiencing a severe mental disease or defect that would support an insanity defense, and that he did "appear to have a basis for a claim of diminished capacity." It does not appear, however, that it is this examination that is the subject of the defendant's motion to compel.

Tenn. Sup. Ct. R. 4(E)(1) ("If an application for permission to appeal is hereafter denied by this Court with a 'Not for Citation' designation, the opinion of the intermediate appellate court has no precedential value."), and should not have been cited in or appended to the defendant's brief, *see* Tenn. Sup. Ct. R. 4(E)(2) ("An opinion so designated shall not be published in any official reporter nor cited by any judge in any trial or appellate court decision, or by any litigant in any brief, or other material presented to any court . . . .").

Moving forward, "[i]t is well settled that the government has the obligation to turn over evidence in its possession that is both favorable to the accused and material to guilt or punishment." *Ritchie*, 480 U.S. at 57 (citing *United States v. Agurs*, 427 U.S. 97 (1976); *Brady v. Maryland*, 373 U.S. 83, 87 (1963)). Indeed, the "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87. To establish a due process violation via the suppression of evidence, the defendant must establish that (1) he "requested the information (unless the evidence is obviously exculpatory, in which case the [S]tate is bound to release the information whether requested or not)," (2) "the State suppressed the information," (3) "the information was favorable to" his case, and (4) "the information was material." *Johnson v. State*, 38 S.W.3d 52, 56 (Tenn. 2001). "Evidence 'favorable to an accused' includes evidence deemed to be exculpatory in nature and evidence that could be used to impeach the [S]tate's witnesses." *Johnson*, 38 S.W.3d at 55-56 (citing *State v. Walker*, 910 S.W.2d 381, 389 (Tenn. 1995); *State v. Copeland*, 983 S.W.2d 703, 706 (Tenn. Crim. App. 1998); *United States v. Bagley*, 473 U.S. 667, 676 (1985)).

> Although courts have used different terminologies to define "materiality," a majority of this Court has agreed, "[evidence] is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome."

*Ritchie*, 480 U.S. at 57 (citations omitted); *see also Bagley*, 473 U.S. at 682.

As discussed above, the record does not contain any pretrial request for any of the information that the defendant later sought to compel from the State. From the record before us, it appears that the defendant's motions to compel were his first request for the information. Indulging the defendant by treating the defendant's motions to compel as a sufficient request for information under *Brady*, we examine each item of requested evidence to determine if the defendant met the remaining factors.

### 1. Statements of the Defendant to Jailers

In our view, the defendant failed to establish that the State suppressed his statement

to the jailers that he had seen a shadow demon in the jail van. As indicated, the defendant did not testify that his statement was recorded or otherwise memorialized in writing. Certainly, no proof established that the prosecutor knew or should have known about the statement. Moreover, even if the defendant could have established that the State suppressed the statement, he failed to establish that it was material. The defendant pursued a defense of self-defense at trial, claiming, via his written and audio-recorded statements, that he was forced to shoot to save his own life after being attacked. At no point in either statement did the defendant claim that his shooting the victims somehow related to his seeing shadow demons. The defendant did not seek to establish a defense of diminished capacity through his questioning of the State's witnesses despite that the results of the forensic mental health evaluation suggested that such a defense could have been supported. Under these circumstances, we cannot say that it is reasonably probable that the disclosure to the defense of the defendant's statement to jailers that a shadow demon accompanied him on a trip to an unspecified mental health facility would have led to a different result. In consequence, the defendant has failed to establish a due process violation stemming from the State's failure to disclose this evidence or the trial court's refusal to grant his motions to compel.

### 2. Transportation Records

Even if we assume that the defendant satisfied the first three *Brady* factors, we cannot say that he established that the records of his transportation from the jail to an unspecified mental health facility were material. Simply no evidence exists to support a conclusion that the disclosure of these records, assuming that they actually exist, results in a reasonable probability that the results of the defendant's trial would have been different.

### 3. Telephone Calls from the Jail

Again, assuming for the sake of argument that the defendant could establish the first three prongs of his claimed due process violation, the record does not support a conclusion that the contents of the defendant's telephone calls to his family during his pretrial incarceration, as alleged by the defendant during his testimony at the hearing on the motions to compel, would have, if disclosed, made it reasonably probable that the results of his trial would have been different. Said differently, the fact that the defendant told any member of his family that he had seen shadow demons would not have altered the results of his trial.

### 4. Results of Mental Health Evaluation

As indicated, the only evidence in the record of the defendant's being taken to a mental health facility shortly after his arrest came from the defendant's testimony at the hearing on the post-trial motions to compel. The defendant claimed that he was taken from the jail to an unspecified mental health facility where he told "a lady" that he had seen shadow demons. In our view, the defendant's testimony does not support a conclusion that any "mental health evaluation" was performed, nor does it support a conclusion that the "results" of any such evaluation actually

-14

exist. Even if we assume, as we have with the other evidence challenged by the defendant, that he could satisfy the first three requirements of a *Brady* claim, we cannot evaluate whether the disclosure of this evidence would have been material because nothing in the record suggests what the "results" of the alleged "mental health evaluation" would have been. The defendant has simply failed to establish any of the four requirements for proving a due process violation with regard to this evidence.

### 5. Ms. Belew's Statements

As proof that he told Ms. Belew about his seeing shadow demons and that she, in turn, told police, the defendant sought to present the testimony of defense investigator Loyce Payne during the post-trial hearing on his motions to compel. The defendant wanted Mr. Payne to be allowed to testify that Ms. Belew told Mr. Payne that the defendant had made the shadow demon revelations to her. The defendant also sought introduction of Mr. Payne's testimony that Ms. Belew told him that she told police that the defendant had claimed to see shadow demons. The defendant also wanted Mr. Payne to testify that Ms. Belew told him that the prosecutor warned her not to mention the defendant's statements about shadow demons and to instead testify that she moved out of the defendant's apartment because of his unwelcome romantic advances or else the State would make things difficult for Ms. Belew with regard to criminal charges pending against her at the time of the defendant's trial. The State objected to Mr. Payne's testimony on grounds that it was hearsay that did not fall within any hearsay exception, and the trial court sustained the objection and excluded the testimony.

Based upon the evidence in the record, the defendant failed to establish a due process violation stemming from the State's alleged suppression of Ms. Belew's supposed revelation to the police that the defendant told her he saw shadow demons. Assuming for the moment that Ms. Belew did tell the police that the defendant told her he saw shadow demons and that the State failed to disclose this statement to the defendant, the defendant has still failed to establish that the statement was material. We cannot say that a reasonable probability exists that, had this statement been disclosed, the results of the defendant's trial would have been different. The defendant pursued a defense of self-defense and made no mention of any diminished capacity. Indeed, the only reference, oblique though it was, to the defendant's mental health, was Ms. Belew's testimony that she moved out because the defendant "wasn't talking sense."

### II. Hearsay

The trial court sustained the State's objection to Mr. Payne's testimony about the substance of Ms. Belew's statement to him, ruling that even if Ms. Belew's statement could have been interpreted as against her penal interest given the implication of her pending criminal case, the defendant had failed to establish that Ms. Belew was unavailable for purposes of Tennessee Rule of Evidence 804. The defendant now challenges the State's alleged suppression of Ms. Belew's pretrial statement regarding the defendant's mental health, the trial court's ruling that Mr. Payne's testimony

was inadmissible hearsay, and the trial judge's failure to remain in the courtroom during his offer of proof regarding Mr. Payne's testimony.

The defendant first asserts that the trial court erred by excluding Mr. Payne's testimony as hearsay because it was not offered for the truth of the matter asserted but was instead "being offered to show that the defense team had a good faith basis to believe that the State possessed" a pretrial statement of Ms. Belew that contained the defendant's revelations about shadow demons and that had not been previously disclosed to the defense.

"'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). "Hearsay is not admissible except as provided by these rules or otherwise by law." *Id.* 802. Tennessee Rules of Evidence 803 and 804 provide exceptions to the general rule of inadmissibility of hearsay. "Because '[n]o factual issue attends' the trial court's determination whether a statement is hearsay, 'it necessarily is a question of law.'" *State v. Ackerman*, 397 S.W.3d 617, 638 (Tenn. Crim. App. 2012) (quoting *State v. Gilley*, 297 S.W.3d 739, 760 (Tenn. Crim. App. 2008) (citing *State v. Schiefelbein*, 230 S.W.3d 88, 128 (Tenn. Crim. App. 2007); *Keisling v. Keisling*, 196 S.W.3d 703, 721 (Tenn. Ct. App. 2005))). "Although the application of the various exceptions to the hearsay rule 'may initially depend upon factual determinations' to which a reviewing court must defer, the trial court 'has no discretion to exclude hearsay exception evidence that is otherwise admissible under the rules of evidence.'" *Ackerman*, 397 S.W.3d at 638 (quoting *Gilley*, 297 S.W.3d at 760-61). "Thus, the appropriate standard of review to be applied to the trial court's decision admitting or excluding hearsay evidence is de novo." *Id.*

Here, the defendant sought to have Mr. Payne testify that Ms. Belew told him that she had told police that the defendant claimed to see "shadow demons" and that it was his behavior regarding the "shadow demons" that prompted her to move out of his apartment. The defendant also sought introduction of Mr. Payne's testimony that Ms. Belew told him that the prosecutor told her to testify that it was the defendant's desire for a romantic relationship that prompted her to move out of the apartment even though it was not true and that the prosecutor threatened her with regard to the outcome of criminal charges pending against her at the time of the trial. The defendant claimed that Ms. Belew's statement about talking to the police provided him with a good faith basis for requesting Ms. Belew's pretrial statement to police via the motion to compel.[3] Thus, he claims that her statement was not offered for the truth of the matter asserted

---

[3]

As we note below, the State provided the defendant's counsel with Ms. Belew's pretrial statements following her direct examination testimony for examination and use during cross-examination. Trial counsel utilized the statements in the cross-examination of Ms. Belew but made no effort to contradict her testimony regarding her motivation for leaving the defendant's apartment or his asking that they engage in a romantic relationship. Moreover, the record establishes that Ms. Belew testified that she moved out because of the defendant's "attitude" and because he "was not talking sensible." With regard to the defendant's desire for a romantic relationship, she testified that the defendant asked her to engage in one, that she declined

and was not, therefore, hearsay. In our view, however, the trial court correctly determined that the statement was hearsay. If Ms. Belew's statement to Mr. Payne that she told police about the defendant's seeing "shadow demons" was untrue, then it was irrelevant and could not have provided the defendant with a good faith basis to seek compulsion of the statement. Said another way, unless her statement to Mr. Payne was true, it could not have served as a basis for the trial court's granting the defendant's motion to compel. Accordingly, the statement concerning Ms. Belew's report to the police was hearsay.

Having concluded that Ms. Belew's statement was hearsay, we must determine whether they were admissible via any exception to the hearsay rule. The defendant claimed admissibility of Ms. Belew's statement via the exception for statements against interest found in Tennessee Rule of Evidence 804(3). That rule provides, as is applicable in this case, for the admission of the hearsay statement of an unavailable declarant "which was at the time of its making . . . so far tended to subject the declarant to civil or criminal liability . . . that a reasonable person in the declarant's position would not have made the statement unless believing it to be true." Tenn. R. Evid. 804(b)(3). As is applicable in this case, a declarant is unavailable for purposes of this rule if the declarant "[i]s absent from the hearing and the proponent of a statement has been unable to procure the declarant's attendance by process." Tenn. R. Evid. 804(a)(5).

The defendant claimed that Ms. Belew's statement was against her penal interest because the State had threatened her with retribution in her pending criminal case[4] if she failed to testify as directed and that Ms. Belew was unavailable under the terms of the Rule. To this end, Mr. Payne testified that he had attempted to contact Ms. Belew on approximately nine occasions via text messages and telephone calls to the cellular telephone number that she provided to him on the date that she gave the statement. He said that he had also "done a couple of Google searches to see if [he] could possibly find an alternate number." Mr. Payne acknowledged that he had not contacted the police department to determine whether they had any contact information for Ms. Belew, that he had not made any attempt to try and contact any member of Ms. Belew's family or anyone with whom she might have contact (like the ex-boyfriend who helped her move and was the father of her oldest child), and that he had not attempted to locate Ms. Belew anywhere in Lewisburg. Instead, he said, his nine attempts at either text messaging or calling her and his inquiries via "Google" were the extent of his search. Importantly, defense counsel acknowledged that he had not made any attempt to issue a subpoena to secure Ms. Belew's attendance at the hearing.

Based on this evidence, the trial court ruled that Ms. Belew was not unavailable. On appeal, the defendant claims that the trial court erred because the evidence established that Ms.

---

graciously, and that the defendant was upset but did not ask her to leave.

[4]

The record does not clearly establish whether the criminal case was still pending at the time Ms. Belew made the statement.

-17

Belew was absent from the hearing and that neither the State nor the defendant had been able to secure her attendance via subpoena because she could not be located "even after diligent search."

Rule 804(a)(5) clearly requires that the party seeking to admit a statement via a hearsay exception contained in Rule 804 establish that "the proponent of a statement has been unable to procure the declarant's attendance *by process*." Tenn. R. Evid. 804(a)(5) (emphasis added). This language clearly refers to the issuance of a subpoena, and the record is clear that the defendant did not even attempt to subpoena Ms. Belew's attendance at the hearing.

The defendant, citing *State v. Summers*, contends that the issuance of a subpoena is not required and that his "diligent efforts" to locate Ms. Belew were sufficient to establish her unavailability. The defendant's reliance on *Summers*, however, is inapt. In *Summers*, the State attempted to secure the attendance of a witness who was "aware of the proceedings and that the [S]tate sought to introduce his testimony" and who had "intentionally absented himself from the proceedings and took steps to keep the [S]tate from discovering his whereabouts." *State v. Summers*, 159 S.W.3d 586, 597 (Tenn. Crim. App. 2004). The witness, who was present on the first day of trial, absented himself from trial thereafter, and "an investigator from the district attorney's office and a police detective testified about the attempts they made to find [the witness] since his disappearance." *Id.* at 596-97. The witness's own attorney "testified that she had spoken with [the witness] two times since his disappearance and had advised him of the significance of his nonappearance" and that the witness "expressed his intent to remain incommunicado." *Id.* at 597. "The victim/witness advocate testified that she doubted that [the witness] had been subpoenaed. A court officer testified that he had subpoenaed [the witness] by mail, and the subpoena had not been returned by the postal service." *Id.* at 596. We concluded that although the record did not clearly resolve the question whether the witness had "actually [been] served with a subpoena," the proof established that the witness was unavailable under the terms of the rule, noting, "Given these facts, the presence or absence of a subpoena appears irrelevant." *Id.* at 597.

The facts in this case do not even come within shouting distance of those presented in *Summers*. In *Summers*, at least some proof showed that the State sought a subpoena and that a subpoena was issued but not returned as served. The defendant here did not even make the attempt. There was no proof that Ms. Belew was aware of the hearing, that she purposefully absented herself from the hearing, or that she was purposefully avoiding the service of process. In our view, less than 10 attempts to contact Ms. Belew via the cellular telephone number provided and a "couple of Google searches" do not a diligent effort make. The trial court did not err by refusing to declare Ms. Belew unavailable.

The defendant also contends that,even if the trial court correctlyruled that Ms. Belew's statement was hearsay, the court should have admitted the statement because the right to due process "trump[s]" the hearsay rule. Although "[p]rinciples of due process require that a defendant in a criminal trial have the right to present a defense and to offer testimony" favorable to his cause, *State v. Flood*, 219 S.W.3d 307, 316 (Tenn. 2007) (citing *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973); *State v. Brown*, 29 S.W.3d 427, 431 (Tenn. 2000)), that right is not

-18

without limits, *see id.* (citing *Chambers*, 410 U.S. at 302). Indeed, the Supreme Court has observed that "[i]n the exercise of this right, the accused, as is required of the State, must comply with established rules of procedure and evidence." *Chambers*, 410 U.S. at 302. "So long as the rules of procedure and evidence are not applied arbitrarily or disproportionately to defeat the purposes they are designed to serve, these rules do not violate a defendant's right to present a defense." *Flood*, 219 S.W.3d at 316 (citing *United States v. Scheffer*, 523 U.S. 303, 308 (1998); *Holmes v. South Carolina*, 547 U.S. 319 (2006); *Chambers*, 410 U.S. at 302). The defendant had already been tried and convicted, so the exclusion of Ms. Belew's testimony did not affect his right to present a defense. Moreover, as discussed above, the defendant failed to establish that he took the necessary steps to either secure Ms. Belew's testimony or establish her unavailability. He is not entitled to relief on this issue.

In a related issue, the defendant complains that the trial court erred by leaving the courtroom without hearing his offer of proof regarding Ms. Belew's statement.

The record establishes that after the trial court ruled that Mr. Payne's testimony was inadmissible hearsay, the defendant sought to make an offer of proof of what his testimony would have been. The trial court agreed that the defendant could do so at the end of the day. When it became apparent, however, that a recess would be necessary for the defendant, the trial court said, "Rather than have [the court reporter] have to do it after court is over, just let her do it right now." The trial judge then observed that "[a]n offer of proof is not an adversarial hearing" and stated, "It is just to preserve your proof. So I'll just walk off and let you call your witness." The court reiterated, "I am not going to consider this as evidence. It is just for purposes of appeal."

The defendant did not object to this procedure in the trial court, and, in consequence, cannot be heard to complain on appeal. Tenn. R. App. P. 36(b) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."); *see also State v. Killebrew*, 760 S.W.2d 228, 235 (Tenn. Crim. App. 1988) (waiver applies when the defendant fails to make a contemporaneous objection); *State v. Jenkins*, 733 S.W.2d 528, 532 (Tenn. Crim. App. 1987); *State v. Rhoden*, 739 S.W.2d 6, 11-12, 18 (Tenn. Crim. App. 1987). Moreover, although a trial judge who absents himself from the hearing on an offer of proof runs the risk of depriving himself of information that could impact the ruling on the admissibility of the evidence or might impact rulings later in the case, that does not appear to be the case here. The trial court had been apprised of the substance of Mr. Payne's testimony before making a ruling, and the offer of proof in this case served the sole purpose of preserving the issue for appellate review.

### III. Rule 26.2

The defendant also contends that the trial court erred by refusing to order the State to produce, post trial, copies of the pretrial statements of Ms. Belew, Mr. Beavers, Ms. Keel, and Ms. Jacobson pursuant to Tennessee Rule of Criminal Procedure 26.2. The State asserts that the trial

court did not err because Rule 26.2 requires only that the State produce a copy of the statement for examination and use by the defendant at trial and does not require the production of copies of any statements post trial.

Because the defendant failed to take any steps to ensure that these statements were included in the record on appeal, he has waived our consideration of this issue. "When a defendant contends that the State has refused to produce a witness's statement as required by Rule 26.2, 'the defendant must take action to have the statement included in the record on appeal, or this court has nothing to review.'" *State v. Dalton Lister*, No. E2012-00213-CCA-R3-CD,slip op.at6 (Tenn.Crim.App.,Knoxville,July12,2013)(citing *State v. John Lee Benson and Torris Benson*, Nos. 67 and 68, (Tenn. Crim. App. Nov. 12, 1987), *perm. app. denied* (Tenn. Mar. 7, 1988) (citing *State v. Robinson*, 618 S.W.2d 754, 761 (Tenn. Crim. App. 1981))). Moreover, the record clearly establishes that the State complied with the requirements of Rule 26.2.

Rule 26.2 of the Tennessee Rules of Criminal Procedure had its genesis in the United States Supreme Court holding in *Jencks v. United States*, 353 U.S. 657 (1957), wherein the court ruled that a criminal defendant had the right to inspect prior statements or reports bygovernment witnesses following direct examination for use in cross-examination. *State v. Caughron*, 855 S.W.2d 526, 535 (Tenn. 1993). The Rule provides,

> After a witness other than the defendant has testified on direct examination, the court, on motion of a party who did not call the witness, shall order the attorney for the state or the defendant and the defendant's attorney to produce, for the examination and use of the moving party, any statement of the witness that is in their possession and that relates to the subject matter of the witness's testimony.

Tenn. R. Crim. P. 26.2(a). The Rule also provides for the production of witness statements "at a motion hearing under Rule 12(b)," *see* Tenn. R. Crim. P. 26.2(e), because, as the AdvisoryCommission Comments explain,"Therewouldbe little logic in requiring statement production onlyat trial, and not at pretrial hearings where testimonyas to the facts of the case is being given under oath," *see id.*, Advisory Comm'n Comments.

In this case, the State produced the pretrial statements of each of these witnesses for examination by defense counsel following each witness's direct examination testimony. The record establishes that defense counsel utilized the statements extensively during cross-examination of the witnesses. The State then asked for the statements to be returned, and defense counsel agreed. This procedure complies with the requirements of Rule 26.2.[5] Rule 26.2 does not require the production

---

[5]

The defendant claims in his brief that the statements were "missing" from the files of his trial
(continued...)

-20

of copies of witness statements after

trial.

To be sure, both *Brady* and Tennessee Rule of Criminal Procedure 16 require the disclosure of anyevidence, including the pretrial statements of potential witnesses for the State, that is exculpatory. The defendant makes no claim that any of the witness statements at issue was exculpatory.

## IV. Newly Discovered Evidence

The defendant contends that the trial court erred by ruling that impeachment evidence could not qualify as newly discovered evidence and by refusing to admit evidence that would impeach Mr. Beavers' credibility. Although the defendant is correct that newly discovered impeachment evidence could, under certain circumstances, be so compelling as to require the grant of a new trial, *see State v. Vasques*, 221 S.W.3d 514, 528 (Tenn. 2007), those circumstances do not exist in this case. The defendant sought to elicit testimony from an individual named Jerron Braden that Mr. Beavers had told Mr. Braden while the two were incarcerated together in a juvenile detention facility that Messrs. Perryman, Beavers, and Keel had "ambushed" the defendant with the intent to rob him. Such a statement would be inconsistent with Mr. Beavers' trial testimony. The trial court ruled correctly that prior inconsistent statements are not substantive evidence. *See State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000) ("Upon timely objection, the trial court should exclude a prior inconsistent statement when offered as substantive evidence of guilt or innocence, and upon request, the court should instruct the jury that the prior statement may only be considered as reflecting upon the credibilityof the witness."). The defendant's reliance on *State v. Brown*, 29 S.W.3d 427 (Tenn. 2000), for the admission of extrinsic evidence of prior inconsistent statements as substantive evidence is inapt. Defense counsel argued at the hearing on the motion for new trial that principles of due process as elucidated in *Brown* permitted the admission of extrinsic evidence of prior inconsistent statements as substantive evidence. *Brown* contains no such holding. To the contrary, the *Brown* majority confirmed in a footnote that "[a] jury considers impeachment proof only when assessing the credibility of witnesses." *State v. Brown*, 29 S.W.3d 427, 432 n.11 (Tenn. 2000) (citing *State v. Martin*, 964 S.W.2d 564, 567 (Tenn. 1998) (citing *State v. Reece*, 637 S.W.2d 858, 861 (Tenn. 1982))). Moreover, we can

[5](...continued)
counsel and "missing" fromthe record of the proceedings. The record, however, clearly establishes that the State produced the statements for examination and use at trial and that trial counsel used the statements during cross-examination and then returned them to the State. The statements were not admitted into evidence at trial. Thus, the defendant's characterization of the documents as "missing" is misleading. We note that the defendant attempted throughout his brief, as well as at the hearings on the motions to compel and the motion for new trial, to ascribe a nefarious intent to the actions of the State when it is apparent that none existed.

find no case that stands for the position espoused by the defendant.

Moreover, Mr. Braden never testified that Mr. Beavers made the alleged inconsistent statements. The defendant called Mr. Beavers as a witness at the hearing on his motion for new trial, and Mr. Beavers denied having been incarcerated with Mr. Braden and denied speaking with Mr. Braden while he was incarcerated. He also denied having discussed Mr. Burgess's case with Mr. Braden. He said that he had never discussed having participated in other ambush thefts, saying, "I have never had no thefts or whatnot." When the defendant attempted to call Mr. Braden as a witness, Mr. Braden's counsel reported that Mr. Braden, who was incarcerated awaiting trial on a charge of first degree murder, would invoke his Fifth Amendment privilege against self-incrimination.

Mr. Braden's invocation of his privilege against self-incrimination leads to the defendant's next ground for relief, that the trial court erred by permitting Mr. Braden's counsel to invoke his client's privilege against self-incrimination because no proof existed that Mr. Braden's testimony would have incriminated him. Mr. Braden's counsel stated,

> Your Honor, just for the record, my client is currently under indictment for first-degree murder.
>
> He does not desire to take the witness stand. He does not desire to be sworn in by the transcription here today. He does not desire to be subject to direct or cross-examination by members of the district attorney's staff or a member of the private bar.
>
> I join in with those desires. We believe he has a 5th amendment right not to be subject to cross-examination, subject to being compelled to testify in anything that would either be discriminatory against himself or could lead to any kind of evidence that could violate his right against remaining silent.

The defendant contends that the trial court should have forced Mr. Braden to testify for the purpose of making an offer of proof. In our view, even if the trial court erred in this regard, the error was harmless because the record does not establish that Mr. Braden's testimony would have changed the outcome of the defendant's trial. *State v. Burns*, 777 S.W.2d 355, 360 (Tenn. Crim. App. 1989) (requiring the grant of a new trial on the basis of newly discovered evidence "when the defendant establishes the following: 1) reasonable diligence in seeking the newlydiscovered evidence; 2) materiality of the evidence; and 3) the evidence will likely change the result of the trial"). Assuming for the sake of argument that Mr. Braden would testify as the defendant claimed he would, that testimony would not have altered the outcome of the defendant's trial. The sole import of the evidence would be to impugn the credibility of Mr. Beavers. Mr. Beavers' account of the offenses, however, was not the only eyewitness account and was corroborated by Ms. Belew, Mr. Keel, and

-22

Ms. Jacobsen.

## *V. Cumulative Error*

Finally, the defendant contends that the cumulative effect of the errors of the trial court deprived him of a fair hearing on his motions to compel and motion for new trial. Having considered each of the defendant's issues on appealand concluded that the defendant is not entitled to relief for any, we need not consider the cumulative effect of the alleged errors. *State v. Hester*, 324 S.W.3d 1, 77 (Tenn. 2010) ("To warrant assessment under the cumulative error doctrine, there must have been more than one actual error committed.").

## *Conclusion*

The defendant has failed to establish entitlement to relief on any of the issues presented. Accordingly, the judgments of the trial court are affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE